The COLORADO GENERAL ASSEM-
BLY, Plaintiff-Appellee,

v.

The Honorable Richard D. LAMM, Gov-
ernor of the State of Colorado,
Defendant-Appellant.

No. 85SA70.

Supreme Court of Colorado,
En Banc.

June 1, 1987.

Rehearing Denied July 13, 1987.

Philip G. Dufford, Gregory A. Ruegseg-
ger, Edward D. White, Welborn, Dufford &
Brown, and Douglas G. Brown, Rebecca C.
Lennahan, William A. Hobbs, Colorado
Legislative Drafting Office, Denver, for
plaintiff-appellee.

Duane Woodard, Atty. Gen., Charles B.
Howe, Chief Deputy Atty. Gen., Richard H.
Forman, Sol. Gen., Denver, for defendant-
appellant.

DUBOFSKY, Justice.

The Governor of Colorado appeals the
Denver district court decision declaring
that the Colorado General Assembly has
the authority to direct state expenditure of
federal block grant monies and that the
governor's vetoes of headnotes that includ-
ed the federal funds in the general appro-
priations bill (the "long bill") in 1982, 1983,
and 1984 violated the doctrine of separation
of powers. We determine that the expendi-
ture of the funds is within the governor's
executive power to make resource alloca-
tion decisions, with the exception of the
portions of the block grants subject to
state matching appropriations and the por-
tions that may be transferred to other
block grants. We affirm the ruling of the
district court in part and reverse in part.

I.

In a headnote to the 1982 long bill, the
general assembly appropriated eight feder-
al block grants for primary care provided
by community health centers, social servic-
es under Title XX of the Social Security
Act, preventive health care, alcohol and
drug abuse and mental health services,
community services, maternal and child
health services, education consolidation and
improvement, and community development
in small cities.[1]  Governor Richard D.

---

1.  The 1982 headnote stated:
   (g)(I) The figures in the "federal funds" col-
umn earned or received under the following

federal programs shall be limits on the
amount of expenditures of such funds, and
such funds shall be expended in accordance

Lamm vetoed the headnote because he believed that legislative appropriation of federal block grants interfered with executive expenditure of federal funds and violated Colorado case law restricting appropriation of federal funds by the general assembly.[2] The general assembly failed in an attempt to override the governor's veto of the headnote relating to block grants.

In November 1982 the general assembly brought suit in Denver district court against Governor Lamm, challenging the governor's veto of the block grant headnote and the governor's veto of portions of the 1982 long bill that designated the sources from which executive officials would obtain cash funding for particular programs. On January 17, 1984, the district court granted summary judgment in favor of the general assembly on the sources of cash funding issue and certified its ruling as final action for purposes of appeal. This court affirmed the district court's judgment on the basis that vetoes restricted to the source of funding, while allowing the amount of funding to remain as established by the legislature, did not relate to entire items and thus were not within the governor's constitutional item veto power under art. IV., sec. 12 of the Colorado constitution. *Colorado General Assembly v. Lamm*, 704 P.2d 1371 (Colo. 1985). The district court reserved ruling on the legislative appropriation of federal funds claim until after trial.[3]

with applicable state and federal statutes, including all provisions of this act:
Primary Care Block Grant
Social Services (Title XX) Block Grant
Preventive Health Block Grant
Alcohol, Drug Abuse, and Mental Health Block Grant
Community Services Block Grant
Maternal and Child Health Block Grant
Elementary and Secondary Education Block Grant
Community Development Block Grant
    (II) The figures in the "federal funds" column earned or received under the following federal programs shall be expended in accordance with applicable state and federal statutes and are included as if they were appropriated:
Wagner-Pyzner Funds
Reed Act Funds
Federal Unemployment Benefit Program Fund
    (III) The figures in the "federal funds" column for all other programs are anticipated federal funds, and, although these funds are not appropriated in this act, they are noted for the purpose of indicating the assumption used relative to those funds in developing the basic appropriations amounts.
The governor lined through paragraph (g)(I). Ch. 1, sec. 2, subsection (1)(g), 1982 Colo.Sess. Laws 4–5.

2. The governor vetoed section 2, subsection (1)(g)(I) of the 1982 long bill for the following reasons:
This headnote may pose practical problems for those agencies receiving the federal funds, particularly in light of the current uncertainty in the federal budget. The limitation of expenditures on federal funds is clearly a violation of the Colorado Supreme Court's decision in *McManus [sic] v. Love* and *Anderson v. Lamm* which prohibit the appropriation of federal funds by the Legislature. While I will direct the departments that receive these funds to honor the intent of the funding in the Long Bill pursuant to our agreement in the Memorandum of Understanding on Federal Funds signed on April 6, 1982, I believe the language contained in this headnote was included prior to the Memorandum, and I cannot let the unconstitutional language in this headnote stand.
Subsection II of this headnote is not vetoed because it is not an indication of the appropriation of federal funds. As with the previous block grants, the Executive intends to honor the intent of the Memorandum of Understanding.
Ch. 1, Item Disapproval, 1982 Colo.Sess.Laws 88–89.

3. In *Colorado General Assembly v. Lamm*, 704 P.2d 1371 (Colo.1985), this court addressed the governor's assertion that the general assembly lacked standing to challenge his vetoes of legislative conditions specifying the sources of cash funding. The governor based his argument on the failure of the legislature to override the vetoes, the general assembly's lack of a legally protected interest because the constitution assigns the legislative power at issue, the veto, to the governor, and the political nature of the veto. We held that to preserve the constitutional balance between the executive and legislative branches of government, "it is essential that the judiciary have the ability to exercise its traditional function of constitutional interpretation and to scrutinize gubernatorial vetoes for constitutional validity," and rejected the governor's argument that the legislature's sole remedy for an invalid veto is to override it. *Id.* at 1377. We identified the purpose of item vetoes as "preventing the governor from modifying an item of appropriation by accepting part and rejecting part" and ruled that the general assembly had standing "to seek determination of the question whether a purported veto is invalid and therefore, if permitted to stand unchal-

In August 1984 the court allowed the general assembly to amend its complaint to include the governor's veto of the 1983 and 1984 long bill headnotes that appropriated the federal block grants that were included in the 1982 headnote and two additional federal grants, the low-income energy assistance block grant and portions of the Job Training Partnership Act, 29 U.S.C. § 1501 et seq. (1982). In January 1985 after hearing testimony from national experts on federal block grants and from state administrators regarding the implementation of the grants in Colorado, the district court concluded that the discretion allowed the state under the federal block grant program included the type of policy decisions that are within the general assembly's power of appropriation. The district court identified the determination of the programs the state will operate and the level of funding to be assigned to each program as legislative policy decisions. The court described executive discretion as deciding how to administer the programs chosen by the legislature.

The district court acknowledged that the language in *MacManus v. Love*, 179 Colo. 218, 499 P.2d 609 (1972), and *Anderson v. Lamm*, 195 Colo. 437, 579 P.2d 620 (1978), "if literally construed, would inescapably lead to the conclusion that the source of the funds is determinative of whether the Legislature may appropriate the funds," and funds that have "the federal government as their source are custodial funds and not subject to appropriation control by the Legislature." The court stated that "[i]t is clear that the *source* of the funds is not dispositive in determining whether or not legislative appropriation is proper"; rather, the court concluded that "it is the custodial nature of the funds" that is determinative. (Emphasis in original.) The court based its reading of *MacManus* and *Anderson* on the legislative role in appropriating federal revenue-sharing funds, a type of federal funding developed after this court's decision in *MacManus*.

The district court entered judgment in favor of the general assembly, declaring that the block grants were subject to the plenary power of legislative appropriation and that the governor's annual vetoes of the block grant headnote were void. The governor appealed to this court.[4] He argues that under *MacManus* and federal law federal funds are custodial funds not subject to the appropriative power of the legislature and that the discretion state officials may exercise in spending federal block grants is not significantly different than the discretion exercised in spending federal categorical grants.

## II.

During the 1960s, federal grants to the states rose from approximately $7 billion provided through 160 categorical grant programs, to approximately $85 billion provided through at least 500 categorical programs. In the late 1960s, the Advisory Commission on Intergovernmental Relations (ACIR), a group of local, state and federal officials created by Congress in

lenged, would cause injury in fact to the legislature's legally protected right and power to make appropriations by majority vote." *Id.* at 1378. Finally, we determined that the question of veto validity is justiciable because it does not involve a political question that should be eschewed by the courts. Rather, a determination of the validity of the veto "requires interpretation of the constitution, a function at the very core of the judicial role." *Id.* at 1378–1379.

Although this court addressed standing and justiciability in the context of item vetoes in *Colorado General Assembly v. Lamm*, the district court ruled on standing and justiciability before it entered summary judgment on the item veto issue, and the district court's determination that the general assembly had standing to challenge the governor's vetoes and that the complaint

raised a justiciable issue encompassed the issue of the power of the legislature to appropriate federal block grants. The governor has not renewed in this appeal his challenge to the standing of the general assembly to litigate his veto of the headnote appropriating federal block grants or the justiciability of the validity of the veto when the general assembly failed to override it.

4. The issue on appeal is whether a portion of the act appropriating state revenues violates the doctrine of separation of powers under art. III of the Colorado constitution. This court has jurisdiction over appeals from a district court judgment in which the constitutionality of a statute is in question. Section 13–4–102(1)(b), 6 C.R.S. (1973).

1959 to monitor intergovernmental relations, suggested that federal assistance to the states be restructured to allow revenue sharing and block grants in addition to categorical grants.

Revenue sharing was a *per capita*, general support payment program designed to provide financial resources to state and local governments to spend for local priorities. The federal revenue sharing statute, 31 U.S.C. § 1243(a)(4) (1976), provided that revenue sharing funds were to be expended in the same manner as a state's own revenue. Federal revenue sharing was in effect between 1972 and 1980, and all state legislatures appropriated federal revenue sharing funds.

The categorical grant was described as a means for furthering national priorities by authorizing grants for programs that met carefully defined federal standards. Categorical grants involve a high degree of federal regulation and often have gone to local governments or independent single-purpose agencies such as urban renewal authorities or housing authorities. At the time this court decided *MacManus v. Love*, 179 Colo. 218, 499 P.2d 609 (1972), most federal funds allocated to Colorado were in the form of categorical grants.

Federal block grants were conceived as falling between the extensive federal control represented by categorical grants and the absence of federal control represented by revenue sharing.[5] ACIR viewed block grants as a means of ensuring that federal funds would be awarded in national priority areas such as health or education, but with a minimum of federal control and with the discretion given to states and local governments to select priorities and projects within the functional areas. ACIR foresaw block grants as: (1) authorizing federal aid for a wide range of activities within a broad functional area; (2) allowing recipients substantial discretion in identifying problems and designing programs to meet those problems; (3) reducing administrative requirements consistent with ensur-

ing the accomplishment of national goals; (4) distributing funds on the basis of a statutory formula that narrowed federal discretion and maintained fiscal certainty for grantees; and (5) providing specific eligibility provisions that tended to favor general purpose governmental units. Advisory Commission on Intergovernmental Relations, *Safe Streets Reconsidered: The Block Grant Experience 1968–1975* 1 (1977).

Under the first major block grant program, Title I of the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. §§ 3701–3713 (1982), the Law Enforcement Assistance Administration (LEAA) distributed funds to entities within the states on a *per capita* basis when the states submitted a plan to LEAA for the use of the funds that met statutory requirements. In 1973 and 1974, congress enacted three more block grants programs: the Comprehensive Employment and Training Act (CETA), 29 U.S.C. §§ 801–837 (Supp. IV 1973), the Housing and Community Development Act, 42 U.S.C. §§ 5301–5320 (Supp. IV 1974), and Title XX of the Social Security Act, 42 U.S.C. § 1397 (Supp. IV 1974). Congress directed most of the early block grants to local governments rather than to the states.

In 1980 the United States comptroller general reported to congress that state legislative involvement in federal grant programs was discouraged by the restrictive nature of the federal grant process and by specific provisions of grant programs that assigned legislative responsibilities to the state executive branch for determining priorities, designating organizations to administer federal programs, and evaluating program performance. Report to the Congress by the Comptroller General of the United States, United States General Accounting Office GGD-81-3, December 15, 1980. The comptroller recommended that congress remove federal constraints on state legislative involvement. *Id.*[6] The Of-

---

5. Several witnesses testified at trial that since block grants were first conceived Congress has tended to add restrictions, a process one witness called "creeping recategorization."

6. The National Conference of State Legislatures identified four means by which state legislative involvement in the oversight of federal grant programs could be increased:

fice of Management and Budget commented on the comptroller general's report, warning that

> [a]ny attempts to redress or 'neutralize' the perceived imbalance in the legislative and executive roles in the federal grant process should be approached with extreme caution for a number of reasons including the diversity of state constitutional provisions, statutes, and practices and the perception that the federal government may be prescribing or defining specific roles within the intragovernmental sphere.

*Id.* at 76, Appendix IV.

In 1981, the Reagan administration proposed a "New Federalism" program to channel federal funds, previously allocated directly to local governments or single purpose agencies, through state governments. "New Federalism" reduced the amount of federal funding for the programs included within the proposal by more than 25 per cent. Congress enacted most of the Reagan proposal in the Omnibus Budget and Reconciliation Act of 1981 (OBRA), Pub.L. 97–35, consolidating approximately 75 categorical grants into nine block grants.[7] Congress did not include in OBRA the

comptroller general's recommendation that would have required state legislative appropriation of the OBRA block grants. While OBRA is silent regarding the authority of state legislatures to appropriate federal block grant funds, the Job Training Partnership Act (JTPA), 19 U.S.C. § 1501 et seq. (1982), that created one of the federal programs at issue in the 1983 and 1984 headnotes, provides that JTPA shall not be interpreted to preclude the enactment of consistent state implementing legislation. 29 U.S.C. § 1536 (1982).

The staff director of the Colorado general assembly's joint budget committee testified at trial that in 1981, after the National Conference of State Legislatures' annual meeting at which a number of federal officials spoke about OBRA, the legislative leadership and the joint budget committee staff met to plan an assertion of legislative appropriation authority over federal block grants. In March 1982 a state auditor's report recommended that the legislature exercise its authority to appropriate all or selected federal funds such as block grants on the assumption that congressional actions and other court rulings subsequent to

---

(1) formal appropriation of federal funds;
(2) acceptance or authorization of the receipt and expenditure of federal funds prior to use by the executive branch;
(3) participation in the development and/or approval of individual grant applications;
(4) development of comprehensive data information systems to continuously track federal receipts.
National Conference of State Legislatures, "State Legislative Control of Federal Funds" at 2 (1978). Testimony at trial indicated that 27 states have federal fund tracking systems and 18 states have legislative procedures for review and comment on state applications for federal funds.

**7.** Despite efforts to reduce the number of federal requirements attached to the block grants, at least fifty-four federal "cross-cutting" laws impose additional requirements on all recipients of federal funds. They include environmental and civil rights laws such as the National Environmental Policy Act of 1969, 42 U.S.C. § 4231, *et seq.* (1970); National Historic Preservation Act of 1966, 16 U.S.C. § 470, *et seq.* (1970); Flood Disaster Protection Act of 1973, 42 U.S.C. § 4001, *et seq.* (Supp. III, 1973); Clean Air Act of 1972, 42 U.S.C. § 1857, *et seq.* (Supp. II, 1972); Federal Water Pollution Control Act of

1948 as amended, 33 U.S.C. § 1251, *et seq.* (Supp. II, 1972); Safe Drinking Water Act of 1974, 42 U.S.C. § 300f, *et seq.* (Supp. IV, 1974); the Endangered Species Act of 1973, 16 U.S.C. § 1531, *et seq.* (Supp. III, 1973); Wild and Scenic Rivers Act of 1968, as amended, 16 U.S.C.A. § 1271, *et seq.* (1976); Historical and Archeological Data Preservation Act of 1960, as amended, 16 U.S.C. § 469, *et seq.* (Supp. IV, 1974); Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (1970); Rehabilitation Act of 1973, 29 U.S.C. § 792, *et seq.* (Supp. III, 1973); Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 (Supp. II, 1972); Indian Self Determination Act, 25 U.S.C. § 450i (Supp. V, 1975); Intergovernmental Cooperation Act of 1968, 42 U.S.C. § 4201, *et seq.* (1970); Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4601, *et seq.* (1970); Hatch Political Activity Act of 1940 as amended, 5 U.S.C. § 1501, *et seq.* (Supp. IV, 1974); Annual Welfare Act of 1970, 7 U.S.C. § 2131, *et seq.* (1970); Demonstration Cities and Metropolitan Development Act of 1966, 42 U.S.C. § 3301, *et seq.* (1970). *See* Madden, 36 Fed.B.J. at 115 (1977). In addition, all recipients of federal funds are required to comply with numerous Office of Management and Budget circulars and federal executive orders.

*MacManus* had expanded legislative authority. Report of the State Auditor, "Approval and Control of Federal Funds in Colorado Performance Audit," March 1982. The auditor suggested that the legislature "chart a new course in its treatment of federal funds which could ultimately result in a new judicial reinterpretation of the State Constitution." *Id.* at 17. The legislative effort led to the 1982 long bill headnote that listed eight federal block grants and specified that they were appropriated by the general assembly. After the governor vetoed the headnote, the general assembly commenced the instant litigation.

### III.

In fiscal year 1982 Colorado received $76,805,775 in federal block grants, approximately 2 per cent of total state revenue. Report of the State Auditor, "Approval and Control of Federal Funds in Colorado Performance Audit" at 17. The amount rose to $125,524,640 for fiscal year 1984 because of the two additional programs listed in the 1983 and 1984 headnotes. In 1984, 11 per cent of federal funding for the states was in the form of block grants. The remaining 89 per cent of federal funding was in the form of categorical grants including entitlement programs such as Medicaid and Aid to Families with Dependent Children. About half of the federal funds that come to Colorado are subject to state matching appropriations. In *Anderson v. Lamm*, 579 P.2d at 625, this court approved the general assembly's control of state funds used to match federal funds through the "M" headnote that sets a maximum amount of general fund monies that may be expended in a federally supported program and automatically reduces the state match if federal funds increase or decrease. Some of the block grants are conditioned upon provision of state matching funds. The legislature in effect determines the amount of federal funds spent for a particular program in Colorado by appropriating the state matching amount.

Much of the testimony at trial outlined the federal statutory requirements for the individual block grant programs and executive administration of the grants in Colorado. We describe each of the programs because the differences are significant and because a generalized description of federal block grants is not sufficient to resolve the issues before us.

### A.

Although the general assembly listed the primary care block grant program, 42 U.S.C. §§ 300y–300y–11 (1982), in the long bill headnotes as subject to legislative appropriation, Colorado has not applied for the primary care block grant. The purpose of the grant is to fund community health centers for medically underserved populations. The program required the state to match 20 per cent of federal funds provided in the first year and one-third of federal funds in the second year. Community health centers that had received funds in prior years were to be funded at the same level during the first two years of the program and to receive special consideration for funding in subsequent years. None of the grant could be used to fund state administration of the program. The federal government continues to fund directly community health providers because Colorado has not applied for the grant.

### B.

The social services (Title XX) block grant, 42 U.S.C. §§ 1397—1397f (1982), is the largest block grant program in Colorado; in 1984, Colorado received $34,395,830 in social services block grant funds. The program, re-enacted as part of OBRA, is a continuation of the Title XX social service grant program established in 1975; it includes funds for child care, protective services for children and adults, foster care, transportation services, family planning, employment services, preparation and delivery of meals to low-income elderly and handicapped persons, and health support services. The money goes to social services providers, not to the recipients of services, and there are a number of statutory restrictions on grant expenditures. The grant does not limit the amount of money the department may spend for administra-

tion and does not require state matching funds. Federal and state audits must be sent to the general assembly. Ten per cent of the grant may be transferred to health or low-income energy block grant programs.

The state department of social services' discretion in the expenditure of funds is the same as it was under the 1975 Title XX program. The associate director of programs for the department testified at trial that the department used the block grant for the same things for which the money was used before OBRA. The associate director stated that the joint budget committee considers the federal block grants in allocating state funds. The associate director also testified that there had not been any transfers of funds from the social services block grant to other block grant programs.

### C.

The preventive health and health services block grant, 42 U.S.C. §§ 300w—300w-6 (1982), consolidated seven former categorical grant programs: water fluoridation, rat control, diagnosis and treatment of hypertension, deterrence of smoking and alcohol use, comprehensive public health services, demonstration programs for home health agencies, and planning for emergency medical assistance. In 1984, the amount of the grant was $1,129,084, a significant reduction from the amount provided under the prior categorical grants. The federal statute authorizing the block grant added 14 new restrictions to the use of the money including the following requirements: 3 per cent of the money would be expended for a rape prevention program; funding of the categorical grantees would be continued; and federal dollars would not be used for programs that the state had funded prior to receipt of the block grant. Seven per cent of the funds from the preventive health block grants may be transferred to other health block grants, and the state may spend up to 10 per cent of the money for state administration. The federal statute requires the general assembly to con-

duct annual hearings on the proposed state plan and distribution of funds.

### D.

In 1984 the alcohol and drug abuse and mental health services block grant, 42 U.S.C. §§ 300x—300x-5 (1982), provided $7,004,000 for services in Colorado. The grant consolidated 10 prior categorical programs. The state spent $30,139,364 from state revenues on alcohol abuse and mental health services in 1984.

The federal statute that authorized the grant required the state to allocate the funds for the first three years between the mental health portion of the grant and the substance abuse portion of the grant in the same proportions as those programs received under the categorical grants. The substance abuse portion received 51.6 per cent of the funds. Of the substance abuse funds, 35 per cent must go to alcohol treatment programs, 35 per cent to drug abuse programs, and a minimum of 20 per cent to prevention programs. The mental health funds are distributed by the state to community health centers for care and treatment of chronically mentally ill persons, severely disturbed children, adolescents and the elderly and all previously funded community mental health centers were required to be funded for the first three years of the block grant.

The state purchases services with the grant money from public or nonprofit programs that, in turn, provide care for the groups to be assisted. The grant cannot be used to provide inpatient services or to purchase buildings, land or major medical equipment. The funds may not be used to replace services that had been provided by the state. The legislature is required to conduct annual hearings on the proposed use and distribution of the grant. The staff director of the joint budget committee testified that the general assembly has used the "M" headnote to appropriate state matching dollars in this area, and in effect the general assembly appropriates the federal funds in the block grant.[8] Up to 10

---

**8.** The only indication at trial that executive officials had not followed the wishes of the general

per cent of the total may be used for state administrative costs, and the state initially could transfer up to 7 per cent of the grant to other health block grant programs. The staff director testified that the general assembly transferred some money from the alcohol portion of the block grant to the maternal and child health block grant because the legislature believed that the provision of services to handicapped children was a higher priority than the provision of alcohol services.

The director of the alcohol and drug abuse division of the state department of health testified that the amount of money available for transfer from the block grant to other health block grants by 1984 was 15 per cent. The director also testified that the state agency's discretion in expenditure of funds under the block grant was almost identical to the agency discretion under the former categorical grants. The director stated that the only change that had resulted from the federal block grant was that the state, as the conduit through which providers of services are funded, was now able to enforce minimum standards of quality for the providers.

The portion of the block grant for mental health services reduced federal funding by 25 per cent. The administrator of management services for the division of mental health in the department of institutions testified that his division passes along federal funding to eleven mental health centers that before 1981 had received the funding directly from the federal government. Those eleven centers also receive state dollars. The other nine mental health centers in the state are totally state-funded, and the joint budget committee worked with the division to appropriate state funds in a manner that equalized the funding for all twenty centers.

### E.

The community services block grant, 42 U.S.C. §§ 9901—9912 (1982), provided $2,806,149 for Colorado to attack the underlying causes of poverty, to provide a wide range of services to low-income individuals including the elderly poor, to provide emergency food to needy persons, to coordinate government and other social services programs for the poor, and to encourage the private sector to help ameliorate poverty. The block grant consolidated seven anti-poverty categorical programs developed in the 1960s. During the first two years, the program required the funds to be distributed to previously funded community action agencies. After the first two years, the state may fund local governments or nonprofit organizations that meet specific criteria. Colorado participated in the program in 1983 and 1984 after receiving a waiver from the federal government that allowed the state to give the funds to county governments in those counties that do not have community action agencies. Local level entities must receive 90 per cent of the funds, and the state may retain up to 10 per cent for state administered programs.

Grant funds cannot be used for land or building acquisition costs other than for energy-related home repairs. Five per cent of the block grant may be transferred to other energy assistance programs, and up to 5 per cent of the allocation may be used for state administrative costs. The state legislature is required to hold annual hearings on the proposed use and distribution of the funds and must receive audit records of the local agencies.

The governor designated the department of local affairs as the administrator of the community services block grant. The deputy director of the department of local affairs testified that the state's only discretion under the grant is to determine which

assembly in administration of block grants was the testimony of the staff director of the joint budget committee that the committee wanted all of the funding for mental health services to go to the community mental health centers, and that instead the division used block grant funds to hire state employees to provide administra-

tive services. The division administrator responded that all of the federal funds went to the community mental health centers, and the centers in turn purchased the administrative services from the division, which under state fiscal rules made the purchase of services from cash funds rather than from federal funds.

entity within a small circle of entities will receive the federal funds. The deputy director described the agency discretion as similar to the discretion the department exercises in determining the recipients of the state division of housing funds. The staff director of the joint budget committee testified that the general assembly had not been involved in anti-poverty programs before the development of block grants and that it did not have any interest in becoming involved in appropriating community services block grant funds.

### F.

In 1984, Colorado received $4,768,449 in federal funds under the maternal and child health services block grant, 42 U.S.C. §§ 701—709 (1982). The state supplied $10,337,787 for the same program in 1984. Federal law requires that the state spend at least three state dollars for every four federal dollars provided for the program, and because of the state matching requirement, the legislature in effect has appropriative authority to direct the expenditure of the federal funds through use of the "M" headnote. The funds are to be used to provide quality health services for mothers and children, to reduce infant mortality, and to provide services for blind and crippled children. Federal law identifies the state health agency as the intended recipient of the funds. For the first two years, federal funds were to be used in the same proportions as under the nine prior categorical grants and for the continuation of projects previously funded. The method of allocating grant funds is left to state determination. Up to 7.5 per cent of the federal allotment may be used for state administrative expenses.

### G.

The elementary and secondary education block grant, 20 U.S.C. §§ 3811—3875 (1982), consolidated 37 prior categorical grant programs and, in 1984, provided $5,200,000 to Colorado, 7 per cent of federal education funds spent in the state. State appropriations for elementary and secondary education in 1984 amounted to

more than $722,000,000. The state may reserve up to 20 per cent of the federal funds provided through the block grant for state programs to: improve basic learning skills; provide support services for school libraries, children with special needs, guidance counseling, teacher training and districts undergoing desegregation; and provide implementation of the metric system, emphasis on arts, consumer education, career education, or improvements in school safety. The 20 per cent of funds allotted to the state may include state costs for administration.

The state must pass through 80 per cent of the block grant to local school districts in accordance with a state-determined distribution formula. The formula must comply with federal guidelines that assure assistance for poor children and children in sparsely populated areas. Local school districts must spend their allocation for one of the purposes of the original 37 categorical programs and cannot use federal grants to supplant local or state funds. Federal law requires local school districts and the governor to appoint advisory committees to consult with parents and teachers about the expenditure of the funds. The state is required to submit a three-year plan to the federal government that illustrates how the funds allotted to the state will be spent. The state is not required to provide matching funds for the block grant, and may not transfer any portion of the grant to other programs.

Federal law designates the state education agency as the agency responsible for the administration and supervision of programs assisted by the education block grant. The assistant commissioner of education for federal relations and instructional services testified that in Colorado the elected members of the state board of education determine how the state's 20 per cent of the federal funds will be spent. The federally required advisory committee composed of teachers, parents, legislators, and superintendents of schools recommends expenditure of the state's share of the funds to the state board of education. The assistant commissioner testified that from the state's 20 per cent, 5 per cent of

the money is used for administration, 25 per cent is passed on to local districts in the form of competitive grants, and the remainder is used for projects that include hiring technical professionals to help school districts with curriculum development and establishing task forces to strengthen graduation requirements. The assistant commissioner explained that the former categorical grants allowed the state more discretion in determining how to use the money than the block grant allows partly because the block grant reduced the amount of money available to the state for administration.

### H.

The community development for small cities block grant, 42 U.S.C. §§ 5301—5317 (1982), consolidated three prior categorical grant programs and in 1984 provided $9,470,000 to Colorado. Community development block grant funds may be used by cities with fewer than 50,000 people to provide housing; assist economic development; upgrade community facilities, including water and sewer facilities; increase employment through downtown revitalization; and enforce housing and sanitary codes. The projects must benefit persons of low or moderate income within the locality. Federal law prohibits the states from refusing to distribute funds to any general purpose unit of local government on the basis of the activities the local government has selected; a state, however, may establish priorities for the distribution of funds to local governments. Prior to the adoption of OBRA, the United States Department of Housing and Urban Development under the 1974 Federal Community Development Block Grant Act directly administered community development funds for cities of all sizes. HUD continues to administer the block grant program for large cities, but the states now control 30 per cent of the original funds for distribution to small cities on a competitive basis. The state may use up to 2 per cent of the grant for administrative purposes.

The governor designated the state department of local affairs to administer the block grant. The director of the department appointed an advisory board composed of five municipal officials and three county commissioners. After public hearings the advisory board formulates the plan to establish state priorities and, with the director, reviews the grant applications from localities. The board then makes funding recommendations, and the director makes the final determination. The deputy director of the department testified that by 1983 the number of federal restrictions on the small cities program had surpassed the number of restrictions when the federal government had administered the program directly. Despite the federal requirement that the state provide 10 per cent in matching funds, the staff director for the joint budget committee testified that the general assembly did not want to become involved in appropriating the funds that are passed through to local governments. The deputy director of the state department of local affairs testified that some members of the department's administrative staff are paid with federal funds, although staff positions are appropriated in the long bill.

### I.

The low-income energy assistance block grant, 42 U.S.C. §§ 8621—8629 (1982), provided $32,697,129 to Colorado in 1984 for the continuation of a single categorical grant program. The program provides assistance to federally-defined eligible low-income households to meet heating and cooling costs. Assistance may be paid directly to eligible households, to vendors or suppliers of home energy, or through tax credits to suppliers of energy. Up to 15 per cent of the funds may be used for weatherization or other energy related home repairs.

No state funds are required to match federal appropriations, and up to 10 per cent of the money allocated may be transferred to community services, social services or health block grant programs. The state may use up to 10 per cent of the grant for planning and administration. The state may administer the program directly or provide assistance to local agencies in administering the program. The federal statute requires that annual audit

reports be sent to the state legislature and encourages legislative oversight hearings.

The governor allocated the block grant funds among three executive agencies: 70 per cent to the department of social services for payment of heating costs for approximately 60,000 households and for a crisis intervention program; the remaining 30 per cent is divided between the department of local affairs' division of housing to administer the weatherization program and the office of energy conservation, which by the time of trial had been transferred from the governor's office to the state department of regulatory agencies. The governor also transferred some of the money from the grant to the social services block grant.

The federal government requires that the highest level of payment for energy assistance be paid to the lowest income households. The state board of social services determines the formula to make the payments in compliance with federal criteria, and the 63 county departments of social services administer the program. Applicants for assistance are entitled to administrative hearings if they disagree with a decision by the county department. The state department sets aside a portion of the grant for cold weather crisis intervention based on data collected from prior winters. The director of the income and support services division of the department of social services testified that the block grant program made two changes in the prior categorical program: the state is now allowed to set the eligibility level for energy assistance at 150 per cent of the federally established poverty level, rather than at 125 per cent of the poverty level under the categorical program; and funds for weatherization are available under the block grant.

#### J.

Under the Job Training Partnership Act (JTPA), 29 U.S.C. §§ 1501—1781 (1982), Colorado in 1984 received $28 million. The JTPA specifies that the governor is responsible for implementing an employment and training program in this state and for the allocation of funds in accordance with the purposes of the act. The purpose of the act is to prepare youth and unskilled adults for entry into the labor force and to provide job training for the economically disadvantaged. Seventy-five per cent of the JTPA funds are for job training, 15 per cent to 20 per cent for summer youth training, and 5 per cent for dislocated workers. The governor's office distributes 78 per cent of the basic job training funds to the ten service delivery areas (areas of 200,000 population or more) in Colorado on the basis of a formula that considers the number of unemployed persons in the area, the excess number of unemployed persons and the number of economically disadvantaged persons. The remaining 22 per cent state share of the basic job training money is allocated as follows: 8 per cent to the state education agency for state education coordination grants; 3 per cent for training programs for economically disadvantaged persons over age 55; 6 per cent for incentive grants to local training programs that have exceeded performance standards; and 5 per cent for auditing, planning and administration. The state must match the 8 per cent allocated for education coordination grants. All of the money for summer youth training and dislocated workers funds is passed through the governor's office to the service delivery areas according to a federal formula.

Local service delivery area plans are formulated by private industry councils appointed by local elected officials. The governor appoints a state job training coordinating council composed as follows: one-third from persons in the private sector, one-third from persons in the public sector, and one-third general membership to advise the governor, with assistance from the local private industry councils, on the state plan to be submitted to the federal department of labor. Several expert witnesses who testified at trial did not consider JTPA to be a block grant because of the federal restrictions on the allocation of JTPA funds, the role of the private industry councils and the state job training coordinating council, and the numerous referenc-

es in the act to the governor's role in allocation of funds.

## K.

The provisions of federal law governing the block grants and the state's continuing administration of the former categorical programs included in the blocks demonstrate that federal law largely controls the disposition of federal block grant funds. In essence the block grant legislation collected former categorical grants, bundled them together, and relabelled the bundles, and in some cases initially reduced the volume of federal regulations. At the same time the legislation significantly reduced the funding available to accomplish federal objectives.

State involvement in many of the programs functions only as a conduit for funds that ultimately are received by the same entities that received them under the categorical programs. Where the regulations provide for additional state administrative decision-making, the relevant decisions either are identical to the ones made by executive officials under the categorical programs or are similar to those made by executive officials in state-funded programs. Such decisions include choosing which of several applicants will receive public funds. Several administrators testified that they worked closely with the legislature in developing their entire budget and that in some programs the general assembly, in effect, appropriated the federal funds through its appropriation of federally-required state matching amounts. The only significant change created by the block grant programs is the power of the state to transfer a certain percentage of several of the grants to other block grants.

## IV.

The 1980 Report of the United States Comptroller General, introduced at trial, cited a National Conference of State Legislatures' study that identified 38 states that exercise "some degree of appropriation control over federal funds during the normal budgetary process." Report to the Congress by the Comptroller General of the United States, GGD–81–3 (Dec. 15, 1980), at 40.[9] According to the comptroller, the level of legislative involvement in the appropriation of federal funds varies from state to state. *Id.* at 39. A few states appropriate specific amounts of the federal funds for specific state programs while others merely appropriate a lump sum in the millions of dollars to the appropriate state agency. *Id.* at 40. In two of the states studied by the comptroller, the degree of legislative involvement in the appropriations process varied from grant to grant and agency to agency within the state. *Id.*

In Colorado the general assembly through its joint budget committee has a more predominant role in formulating the state's annual budget than the legislatures in most other states. One commentator described state legislative budget power as ranging from the limited power to review and make reductions in the executive budget in Maryland to "actual legislative development of the state budget in Colorado, New Mexico and Texas." W. Pound, "The Legislatures," 25 *The Book of the States 1984–1985* 79, 82 (1985). The joint budget committee in Colorado requires state agencies to submit proposed budgets directly to the legislature and to the governor. The joint budget committee then develops its own budget from the proposals submitted by the executive agencies. *See Colorado General Assembly v. Lamm,* 700 P.2d 508, 523 (Colo.1985).

State courts that have considered whether state legislatures may appropriate federal funds have reached a variety of results. In *State ex rel. Sego v. Kirkpatrick,* 86 N.M. 359, 524 P.2d 975 (1974), the Supreme Court of New Mexico ruled that the legislature did not have the authority to appropriate non-state funds available to institutions of higher education. In *Navajo Tribe v.*

**9.** The National Conference of State Legislatures' survey indicates that 31 of the 38 states exclude grants to state institutions of higher learning from the state appropriations process because of the special status traditionally accorded state universities. Report to the Congress by the Comptroller General of the United States, GGD–81–3 at 40 (Dec. 15, 1980).

*Arizona Dept. of Administration,* 111 Ariz. 279, 528 P.2d 623 (1974), the Supreme Court of Arizona held that payment into the state treasury of federal funds for economic development contracts with the Navajo tribe and the cities of Phoenix and Tucson did not convert the money into funds belonging to the state and thus subject to appropriation by the legislature.

In response to a question from the state senate, the Supreme Court of Massachusetts held that a proposed statute requiring state legislative appropriation of all federal grants and funds would be unconstitutional. *Opinion of the Justices to the Senate,* 375 Mass. 851, 378 N.E.2d 433 (1978). The court determined that, despite section 1 of article 63 of the Massachusetts constitution that requires that "All money received on account of the commonwealth from any source whatsoever shall be paid into the treasury thereof," funds held in trust to be disbursed according to congressionally prescribed conditions are not subject to state legislative appropriation. *Id.* 378 N.E.2d at 436. The court noted that not all federal moneys are received in trust and that "[f]ederal reimbursements may be made to a State without conditions imposed as to expenditure. This money would be subject to the legislative power of appropriation." *Id.*

In contrast, in *Shapp v. Sloan,* 480 Pa. 449, 391 A.2d 595 (1978), *appeal dismissed sub nom. Thornburgh v. Casey,* 440 U.S. 942, 99 S.Ct. 1415, 59 L.Ed.2d 630 (1979), the Supreme Court of Pennsylvania upheld a statute requiring all federal funds to be deposited in the state's general fund and to be available for appropriation by the general assembly. After noting that from 1961 to 1975, the annual appropriations acts contained a provision that all moneys received from the federal government "shall be paid into the general fund and are hereby appropriated out of the general fund for purposes of the respective appropriations" and that the executive branch did not object to the provisions in the acts, *id.* 391 A.2d at 599, the court observed:

> As long as the funds are not diverted from their intended purposes and the terms and conditions prescribed by the congress are not violated, there is no inconsistency between the provisions of the federal programs and state legislative administration of the funds. The federal government has expressly given the states a wide discretion in dealing with these funds. That discretion is most logically exercised by the branch of state government which is constitutionally empowered to exercise control over *all* expenditures.

*Id.* 391 A.2d at 606 (emphasis in original). The Pennsylvania court based its decision on article III, section 24 of the Pennsylvania constitution, which provides that "[n]o moneys shall be paid out of the treasury, except on appropriation made by law," and concluded that the constitution gave the general assembly the power to pay money out of the state treasury without regard to the source of the funds.

The New York Court of Appeals determined in *Anderson v. Regan,* 53 N.Y.2d 356, 442 N.Y.S.2d 404, 425 N.E.2d 792 (1981), that federal funds deposited in the state treasury were subject to legislative appropriation because article VII, section 7 of the New York constitution provides that "no moneys shall ever be paid out of the state treasury or any of its funds or any of the funds under its management, except in pursuance of an appropriation by law," and the doctrine of separation of powers required legislative participation in the budget process to ensure accountability. The court noted that the New York legislature had not been consistent in its approach to appropriation of federal funds.

In 1982 the Supreme Court of Oklahoma held in *Application of State ex rel. Dept. of Transp.,* 646 P.2d 605 (Okla.1982), that a federal grant for revitalization of railway property was not state money subject to legislative appropriation. The court ruled broadly:

> Federal money deposited in the state treasury pursuant to some grant-in-aid program is held in trust for a specific purpose. Like other custodial funds, it retains its original legal character. The legislature wields *no* authority over such funds. It may not subvert congressional

policy by diverting the money to another purpose. Once accepted by the state, federal funds stand burdened with a trust which follows them from the moment of the deposit.

*Id.* at 609–610 (emphasis in original) (citations and footnotes omitted). Again, in contrast, the Supreme Court of Kentucky ruled in *Legislative Research Comm'n v. Brown,* 664 S.W.2d 907 (Ky.1984), that the state legislature has the power to appropriate federal block grant funds. Without discussion, the court declared that federal tax dollars "delivered to the state ... become state controlled money to be spent in accordance with the state budget document." *Id.* at 928.

State courts have not felt constrained by federal law to reach conclusions that uniformly grant state legislatures the power of appropriation over state funds. Congress has left the issue of state legislative appropriation of federal block grants for each state to determine. State courts that have considered the issue have relied on the state constitution, historical practices and case law. We thus turn to Colorado law for a resolution of the issue before us.

### V.

Article III of the Colorado constitution provides:

> The powers of the government of this state are divided into three distinct departments,—the legislative, executive and judicial; and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any power properly belonging to either of the others, except as in this constitution expressly directed or permitted.

Although it is the province of the general assembly to enact legislation and the province of the executive to see that the laws are faithfully executed, *Colorado General Assembly v. Lamm,* 704 P.2d 1371, 1380; *Anderson v. Lamm,* 195 Colo. 437, 579 P.2d 620 (1978), the "delineation of the

dividing line between these powers is often difficult and must be accomplished on a case-by-case basis." *Colorado General Assembly v. Lamm,* 704 P.2d at 1380; *Anderson v. Lamm,* 579 P.2d at 623; *MacManus v. Love,* 179 Colo. 218, 221, 499 P.2d 609, 610 (1972).

■ The power of the general assembly over appropriations is plenary,[10] subject only to constitutional limitations. *Colorado General Assembly v. Lamm,* 704 P.2d at 1380; *Anderson v. Lamm,* 579 P.2d at 623; *MacManus v. Love,* 499 P.2d at 610. Art. V, sec. 32 of the Colorado constitution states, "The general appropriations bill shall embrace nothing but appropriations for the expense of the executive, legislative and judicial departments of the state, state institutions, interest on the public debt and for public schools. All other appropriations shall be made by separate bills, each embracing but one subject." Art. V, sec. 33 provides, "No moneys in the state treasury shall be disbursed therefrom by the treasurer except upon appropriations made by law, or otherwise authorized by law, ..." Under art. IV, sec. 12 the governor has "power to disapprove of any item or items of any bill making appropriations of money, embracing distinct items, ..." *See Colorado General Assembly v. Lamm,* 704 P.2d at 1380. A number of Colorado cases have addressed what constitutes "moneys in the state treasury" and the roles of the legislative and executive branches of state government with respect to the appropriations process.

The case that first addressed the longstanding dispute between the governor and the general assembly about appropriation of federal funds is *MacManus v. Love,* 499 P.2d 609. In *MacManus* this court considered a governor's veto of a portion of the long bill that prevented the executive branch of government from spending any federal funds received by any agency in excess of the agency's appropriation without additional legislative appropriation. We held that the long bill's limitation on

---

**10.** BLACK'S LAW DICTIONARY 1313 (4th ed. 1957) defines "plenary" as "complete, absolute, unqualified."

executive expenditure of federal funds violated the constitutional doctrine of separation of powers because the funds at issue were not state moneys. The long bill condition was an attempt "to limit the executive branch in its administration of federal funds to be received by it directly from agencies of federal government and unconnected with any state appropriations." *MacManus,* 499 P.2d at 610.[11]

*MacManus* relied on *Bedford v. People ex rel. Tiemann,* 105 Colo. 312, 98 P.2d 474 (1939) (state board of vocational education had complete discretion over expenditure of federal funds but any amount to be paid from state funds was limited by legislative appropriation), to support the statement that "federal contributions are not the subject of the appropriative power of the legislature," and on *Stong v. Industrial Commission,* 71 Colo. 133, 204 P. 892 (1922) (moneys in the state compensation fund paid by employers may not be considered "state money" because by statute state treasurer is mere custodian of the fund) to support the sentence, "Custodial funds are not state moneys."[12] *MacManus* can be read to hold that "unmatched" federal funds are custodial funds, and thus cannot be subject to legislative appropriation.[13]

In *Anderson v. Lamm,* 195 Colo. 437, 579 P.2d 620 (1978), several members of the general assembly sought a declaratory judgment to invalidate the governor's vetoes of nine portions of the long bill. The district court dismissed the complaint on the basis that the vetoed portions were unconstitutional conditions that violated separation of powers. This court reversed the district court ruling with respect to the "M" headnotes:

> [t]hese headnotes purport only to condition the appropriation of state, not federal, funds. They do not limit the executive branch in its staffing, resource allocation, or general administration of the federal funds it receives.... They simply prescribe the amount of state funds which can be used when certain amounts of federal funds are available for use.

In essence, the legislature has been required by practical necessity to employ a formulary method for stating the amount of each of these appropriations. This is necessary because at the time the

11. *MacManus* stated that "the general assembly can appropriate state moneys conditioned upon the receipt of matching federal moneys." 499 P.2d at 610.

12. *Stong v. Industrial Commission,* 71 Colo. 133, 204 P. 892 (1922), upheld the statutory authority of the general assembly to appropriate the salaries of compensation fund employees out of fund premiums and to determine the number of employees based on a budget submitted to the joint budget committee after approval by the executive director of the department of labor and employment and the commissioner of insurance. In *Bedord v. The People ex rel. Tiemann,* 105 Colo. 312, 98 P.2d 474 (1939), the court allowed the general assembly to appropriate the director's salary in the long bill less any amount received from the federal government because the salary condition was not an attempt to circumvent the powers of the state board of vocational education in the expenditure of federal funds.

13. The governor argues that federal funds are custodial funds that must be spent as the federal government directs because once the state applies for a grant and receives the funds it must comply with all federal requirements applicable to the program. The remedy for failure to comply with federal grant conditions is termination of the grant. *Pennhurst State Schools v. Halder-*

*man,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). Federal funds misused by a grantee may be recoverable retroactively. *Bell v. New Jersey,* 461 U.S. 773, 103 S.Ct. 2187, 76 L.Ed.2d 312 (1983). The United States retains a property interest in block grant funds appropriated to a state after the state has distributed the funds to a nonprofit community service organization. *Palmiter v. Action, Inc.,* 733 F.2d 1244 (7th Cir. 1984). Recipients of federal grants remain accountable to expend the grants for the purposes designated by congress even though grantees may have wide discretion to choose among specific programs that serve the federal objective. *Dixson v. United States,* 465 U.S. 482, 104 S.Ct. 1172, 79 L.Ed.2d 458 (1984). *See also United States v. Orleans,* 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976) (federal government conditions receipt of federal funds on compliance with federal objectives). *See also* Madden, *Future Directions for Federal Assistance Programs: Lessons from Block Grants and Revenue Sharing,* 36 Fed.B.J. 107, 110–11 (1977). The governor asserts that, because congress has appropriated federal block grants for the ultimate benefit not of the state but of identified third parties, the decision in *MacManus* that federal funds are custodial and not subject to legislative appropriation should apply to block grants.

appropriation bill is passed it is impossible for the legislature to know how much federal funding will become available at a later time for each such program. The important point is that the legislature is exercising control only over the *amount* of *state funds;* no control is asserted in the Long Bill over how the money is to be allocated.

*Id.* 579 P.2d at 625–26 (emphasis in original).

The court, after analyzing each of the vetoed items, affirmed the district court determination that the doctrine of separation of powers was violated by those portions of the long bill that specified the number of full-time employees in each county to be assigned to specific social services job categories, restricted the facilities that could receive a rate increase for residential child care without approval of the joint budget committee, and conditioned some appropriations on reports to the joint budget committee. The court observed that "the general assembly is not permitted to interfere with the executive's power to administer appropriated funds, which includes the making of specific staffing and resource allocation decisions," and that "the legislature may not attach conditions to a general appropriation bill which purport to reserve to the legislature powers of close supervision that are essentially executive in character." *Id.* 579 P.2d at 623–24. In addition the court stated that the executive branch has authority to make contracts and enter into agreements with various facilities as to reimbursement rates. *Id.* 579 P.2d at 627.

In *Colorado General Assembly v. Lamm,* 700 P.2d 508 (Colo.1985), a case decided after the district court ruled in the instant case, this court determined that the governor's transfer of funds from one executive department to another, although made under the authority of a statute giving the controller the authority to recommend transfers between appropriations that would become effective upon approval by the governor, violated the general assembly's constitutional plenary power of appropriation. We concluded that the "transfer ... altered dramatically the ob-

jectives which the General Assembly had determined were to be achieved through use of state moneys" and that "whatever inherent authority to administer the executive budget may exist in the office of the chief executive, such authority may not normally be invoked to contradict major legislative budgeting determinations." *Id.* at 521.

In addition to the validity of the governor's transfer of funds, this court considered in *General Assembly v. Lamm,* 700 P.2d 508, whether the governor had the authority to direct the expenditure of $306,-783 paid to Colorado by Standard Oil Company of California (Chevron) as part of a consent order settling administrative and judicial proceedings brought by the United States Department of Energy (DOE) alleging that Chevron violated federal price-control legislation in sales of petroleum and natural gas products. Colorado was required by the consent order to choose how its share of the Chevron payment would be spent from a list of possible uses published by DOE in the Federal Register, 46 Fed. Reg. 41,854 (1981). A Chevron representative described acceptable uses of the payment, including energy conservation or energy research, in a letter addressed to the Colorado office of energy conservation. DOE and Chevron retained ultimate authority to approve any proposed use of the funds. The general assembly, dissatisfied with the governor's allocation of the Chevron funds to the office of energy conservation, sought a declaration that the funds were subject to legislative appropriation.

This court noted that the general assembly did not dispute "the principle that the Governor may exercise control over funds received by the state which are 'custodial' in nature—funds not generated by tax revenues which are given to the state for particular purposes and of which the state is a custodian or trustee to carry out the purposes for which the sums have been provided," citing *Pensioners Protective Association v. Davis,* 112 Colo. 535, 150 P.2d 974 (1944) (payment of attorneys fees for successful prosecution of class action compelling state to restore funds unconstitu-

tionally diverted from state Old Age Pension Fund did not violate principle of state sovereignty because Old Age Pension Fund was not "public fund" belonging to state; instead, state was merely custodian of fund collected or voluntarily contributed for sole benefit of contributors). *Colorado General Assembly v. Lamm,* 700 P.2d at 524. We determined that the Chevron payment was not subject to appropriation by the general assembly because the money, whether from a private source or from a federal source because it had been approved by federal administrative authority, was required to be used for a purpose approved ultimately by non-Colorado authorities. *Id.* at 525. Moreover, while the choice of which of several options should be selected was a determination that would affect the level of activity of some governmental department, "the role of the state in administering the fund, as determined by the external source generating the revenue, was essentially custodial in nature." *Id.* We stated in *Colorado General Assembly v. Lamm,* 700 P.2d at 525, that "[t]he fact that a discretionary determination had to be made concerning the object for which those non-Colorado sums would be spent is not the controlling factor in assessing the nature of the fund." Our resolution of the Chevron payment issue is consistent with this court's description of the executive's power to administer appropriated funds in *Anderson v. Lamm.*

### VI.

A commentator describing the role of state legislatures in federal grant programs observed that *MacManus v. Love,* 179 Colo. 218, 499 P.2d 609 (1972), leads to an examination of each federal statute under which Colorado receives funds to determine whether legislative appropriation was permissible. Brown, *Federal Funds and National Supremacy: The Role of State Legislatures in Federal Grant Programs,* 28 Am.U.L.Rev. 279, 289 (1979). This court's decisions in *Anderson v. Lamm,* 195 Colo. 437, 579 P.2d 620 (1978) and *Colorado General Assembly v. Lamm,* 700 P.2d 508 (Colo.1985), confirm the commentator's observation.

The district court, without examining the nature of each of the block grants at issue here, ruled that all of the block grant programs allowed the state to exercise the type of discretion in spending the funds that is encompassed within the general assembly's power of appropriation. The district court's decision, however, did not consider the differences in the block grants, and, because the ruling was made before we decided *Colorado General Assembly v. Lamm,* 700 P.2d 508, it did not consider our holding that the existence of discretion concerning the object for which the sums would be spent does not control whether the legislature has the power to appropriate the funds. *Id.* at 525.

■ We examine each of the block grants to determine whether all or a portion of the grant should be subject to legislative appropriation. First, we consider the effect of a provision requiring state matching funds. In *Anderson v. Lamm* this court held that the "M" headnote that regulates the amount of state money appropriated to match federal funds is within the legislative power of appropriation. To the extent that the headnote vetoed by the governor in the instant case, *see* footnote 1, *supra,* can be read as having the same effect as the "M" headnote with respect to the portions of the federal grants that require state matching funds, the legislative enactment of the headnote does not violate the doctrine of separation of powers. State matching funds are required for the maternal and child health services block grant, for 10 per cent of the community development for small cities block grant, and for that portion of the JTPA that is allocated to education coordination.

Second, we address the portions of the block grants that federal law allows to be transferred to other block grants. Up to 7 per cent of the preventive health and health services block grant and up to 15 per cent of the alcohol and drug abuse and mental health services block grant may be transferred to other health block grants. Up to 5 per cent of the community services block grant may be transferred to the low-

income home energy assistance block grant. Up to 10 per cent of the social services block grant may be transferred to other health or low-income energy assistance block grants. Up to 10 per cent of the low-income home energy assistance block grant may be transferred to community services, social services or the health block grants. The record reveals only two transfers from one block grant to another: the staff director of the joint budget committee testified that the general assembly transferred money from the alcohol portion of the alcohol and drug abuse and mental health services block grant to the maternal and child health block grant, and a department of social services division director testified that the governor transferred some of the money from the low-income energy assistance block grant to the social services block grant.[14]

In *Colorado General Assembly v. Lamm*, 700 P.2d 508, the court held that the governor's transfer of state funds from one executive department to another, when the transfer altered dramatically the general assembly's objectives, violated the doctrine of separation of powers. We recognize that block grant funds subject to transfer are not state moneys, but we also recognize that the amount of flexibility allowed the state in determining the purposes for which the funds subject to transfer may be spent is inconsistent with a description of the governor's exercise of authority over the funds subject to transfer as "essentially custodial in nature." *Colorado General Assembly v. Lamm*, 700 P.2d at 525. The transfers alter the initial objectives of the federal government and affect the allocation of state funds for objectives similar to those affected by the transfer of block grant funds. Therefore, those portions of the block grants that may be transferred from one block to another as authorized by federal law are subject to

legislative appropriation consistent with the requirements of federal law.

Finally, we review the remaining parts of the block grants. The federal statutes authorizing the grants specify the purposes the state is directed to accomplish with the money, the manner in which the purposes are to be accomplished and the restrictions placed on use of the funds by the federal government. The block grants do not include the unrestricted spending feature of the now-expired federal revenue sharing program. Aside from the matching and transfer provisions, the remainder of all of the grants are encompassed within the description in *Anderson v. Lamm*, 579 P.2d at 623-625, of the executive's power to administer appropriated funds that includes the making of specific staffing and resource allocation decisions and the general administration of federal funds. The executive power to allocate resources includes "the determination of which specific purpose among several options should be benefited" and is consistent with "the role of the state in administering a fund that is essentially custodial in nature." *Colorado General Assembly v. Lamm*, 700 P.2d at 525. Just as the governor's exercise of authority over the Chevron fund did not invade the general assembly's right to appropriate state funds,[15] here too the governor's exercise of authority to administer the federal block grants in a manner consistent with federal purposes does not violate the doctrine of separation of powers.

To the extent the district court ruling held that all federal block grants are subject to legislative appropriation in Colorado, we overrule the decision of the district court. We affirm the district court's decision to the extent that the legislature has appropriative authority when matching state funds are required as part of block grant programs and when federal legislation authorizing a block grant allows a

---

**14.** Our holding that the general assembly has the power to appropriate the portion of federal block grant funds subject to transfer to other block grants is not to be read as limiting the governor's power to veto the transfers. If the general assembly wishes to direct the expenditure of a block grant transfer that has been vetoed by the governor, the general assembly must override the governor's veto.

**15.** The options for spending the Chevron fund—a choice from several alternatives within a fairly narrow general area—were akin to the options for spending block grants.

portion of that grant to be transferred to other block grants.

Judgment affirmed in part and reversed in part.

ERICKSON, J., does not participate.