IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA18-581

Filed: 19 March 2019

Guilford County, No. 15 CVS 4101

THE ESTATE OF ROBERT EUGENE TIPTON, JR., BY AND THROUGH HIS ANCILLARY ADMINISTRATOR, DEBORAH DUNKLIN TIPTON AND DEBORAH DUNKLIN TIPTON, INDIVIDUALLY, Plaintiff,

v.

DELTA SIGMA PHI FRATERNITY, INC., MICHAEL QUBEIN, INDIVIDUALLY AND AS AN AGENT FOR DELTA SIGMA PHI FRATERNITY, MARSHALL JEFFERSON, INDIVIDUALLY AND AS AN AGENT FOR DELTA SIGMA PHI FRATERNITY, HIGH POINT UNIVERSITY, NIDO QUBEIN, INDIVIDUALLY AND AS PRESIDENT OF HIGH POINT UNIVERSITY, Defendants.

Appeal by defendants from order entered 29 December 2017 by Judge Michael D. Duncan in Guilford County Superior Court. Heard in the Court of Appeals 29 January 2019.

*Donald H. Beskind, P.A., by Donald H. Beskind, and Thomas, Ferguson & Mullins, LLP, by Jay H. Ferguson, for plaintiffs-appellants.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, by Clint S. Morse, and Cokinos Young, by Jennifer A. Riso, for defendant-appellee Delta Sigma Phi Fraternity, Inc.*

DAVIS, Judge.

Robert Eugene Tipton, Jr., a student at High Point University ("HPU") and a pledge of the local chapter of the Delta Sigma Phi fraternity, died on 26 March 2012. At the time of his death, he was an overnight guest at the apartment of another member of the fraternity, Marshall Jefferson. Tipton's estate subsequently brought

a lawsuit (the "Wrongful Death Action") against various individuals and entities, including Delta Sigma Phi Fraternity, Inc. (the "Fraternity"), in connection with Tipton's death. In its complaint, Tipton's estate alleged that his death occurred as a result of hazing and that the Fraternity had breached the duty of care it owed to prospective members of local chapters such as Tipton to protect them from the harms associated with hazing-related activities. The trial court granted summary judgment in favor of the Fraternity. Because we conclude that Plaintiff has failed to offer sufficient evidence — as opposed to mere conjecture — from which a reasonable factfinder could determine that Tipton's death was proximately caused by hazing, we affirm.

**Factual and Procedural Background**

The Fraternity was founded in 1899 and is headquartered in Indianapolis, Indiana. It extends charters to groups of undergraduate students at colleges and universities throughout the country. In doing so, the Fraternity "permits the local chapter to affiliate with and use its name, and provides the chapter with access to educational resources and leadership opportunities." The Fraternity currently has 110 active chapters at colleges and universities with a total of approximately 6,000 undergraduate members. At all times relevant to this litigation, a chartered chapter (the "HPU Chapter") of the Fraternity existed at HPU.

The Fraternity's Constitution and Bylaws provide it with the power to suspend or revoke a local chapter's charter. With regard to the role of the Fraternity in the operations of local chapters, its Constitution states, in pertinent part, as follows:

> Neither the national Fraternity nor its officers has control of or responsibility for the day-to-day operations of its individual members, chapters, colonies or the separate alumni organizations. However, should it come to the attention of any officer of the national Fraternity that any policies or practices of an undergraduate chapter or colony . . . or any individual member are in violation of this Constitution, its Bylaws, or the stated policies of this Fraternity, then such actions as may be appropriate may be taken[.]

A separate document entitled "The Fraternity Manual" that was distributed by the Fraternity to local chapters expressly prohibited hazing.

> No chapter shall conduct hazing activities. Hazing activities are defined as any act or attempt to embarrass, humiliate, intimidate, ridicule, shame or endanger physically or mentally any person, or to compel physical activity or do physical or emotional harm to any person, or to require consumption or ingestion of liquids, food, or other materials.

During the spring of 2009, an allegation of hazing was made by a pledge of the HPU chapter named Hugo Hormazabal to HPU administrators and the national headquarters of the Fraternity. Following Hormazabal's complaint, the executive director of the Fraternity sent the HPU Chapter a letter on 7 April 2009 stating that the Fraternity had "temporarily suspended" the HPU Chapter due to "allegations that members of the new member class are being hazed." The letter further stated

that the Fraternity would conduct "[a]n investigation into the activities surrounding the chapter's new member education program."

As a part of this investigation, a Fraternity representative traveled to HPU and interviewed Hormazabal. During his interview, Hormazabal described the hazing that had occurred as part of his pledging process:

> During one hazing incident, the Delta Sig members made me and the other pledges stand around a kiddie pool lined with a garbage bag in the basement of the fraternity house. The Delta Sig members then ordered us to drink warm corn whisky until we vomited so much we filled the kiddie pool with our vomit.
>
> During another hazing incident at the fraternity house, Delta Sig members put a hood over my head, told me, "This will break you down and build you back up," and then hit me all over my body.
>
> As a result of this incident, I suffered an injury to my right shin, which in retrospect I believe may have been fractured by the blows I received from the Delta Sig members. The injury still causes me pain to this day.

On 17 April 2009, Gail Tuttle, the Vice President for Student Life at HPU, sent a letter to the Chapter outlining a lengthy list of sanctions that "[HPU] and [the Fraternity] have jointly levied against [the HPU Chapter] as a result of hazing incidents that occurred in the Spring 2009." The letter further provided that "[i]f all of the above stipulations are not met at the end of the 2009-2010 academic year, the chapter will lose the privilege of its chapter house for the 2010-2011 academic year."

During the 2011-2012 academic school year, Robert Tipton was enrolled as a student at HPU. In the spring of 2012, he accepted a bid from the HPU Chapter to begin the pledging process to become an initiated member. A student named Michael Qubein who was an initiated member of the HPU Chapter and served as the "pledge educator" was charged with overseeing the pledging process for Tipton's pledge class. Jefferson was also an initiated member of the HPU Chapter during the time period in which Tipton was pledging. Jefferson and Tipton had become close friends during the year before Tipton made his decision to pledge the fraternity.

During the pledging period, Tipton sent messages via text and Facebook to various friends describing his pledging experience. In one such text, he wrote that he was "getting hazed bad now and need Xanax. I didn't even sleep last night and was shaking." With regard to an upcoming HPU Chapter event, Tipton sent a Facebook message to a fellow pledge reassuring him that "they're just going to yell at us a bunch and maybe make us work out or eat something nasty. [T]hey can't kill us[.]"

George Reece, a fellow member of Tipton's pledge class, stated in his deposition testimony that on one occasion he was "hit with a paddle on the butt three times" by Qubein as part of the pledging process. He also testified that on another occasion he and other pledge class members were forced to perform physically demanding exercises for prolonged periods at Qubein's house as a part of "Hell Week" — the final

week before the conclusion of the pledging period. Reece stated that he became so exhausted from the intense exercise that he vomited. He further testified that although pledge class members were required at various times to clean the residences of certain members of the HPU Chapter, he was unaware of any pledges being forced to clean Jefferson's apartment.

On 25 March 2012, Jefferson invited Tipton over to his apartment to "hang out" and have "brother-on-brother time" because he knew Tipton "was having a tough time balancing school and fraternity and . . . life in general[.]" Tipton arrived at Jefferson's apartment that night around midnight. Jefferson did not observe any head wounds or facial injuries on Tipton upon his arrival.

According to Jefferson's deposition testimony, he and Tipton "did some drugs" and shared a bottle of wine during the early morning hours of 26 March 2012. Jefferson testified that they split one pill of Oxymorphone between them and each took one Klonopin.

That same night, two female friends visited Jefferson and Tipton at the apartment before subsequently departing. At some point during the pre-dawn hours of 26 March 2012, Tipton sent the following text to the other members of his pledge class:

> Dear bros, as of recent events I feel like a lot of u [sic] are mad at me for one reason or another[.] I'm very sry [sic] for losing yal [sic] respect so I would really appreciate [i]t if I could meet up w[ith] each one of u [sic] individually to

> talk about how I could do my job as [pledge class president]
> better, thanks bros just let me know when ever [sic] we can
> talk[.]

Jefferson testified that he and Tipton went to bed at approximately 4:00 a.m. and that Tipton slept "on the makeshift bed that [Jefferson] made him on the floor." Jefferson stated that when he left the apartment to go to class at approximately 9:00 a.m. Tipton was "[s]noring loud as a bulldozer" while lying on his back. When Jefferson returned to his apartment later that morning, he saw that Tipton was "[p]ale, discolored," and nonresponsive with vomit visible around his mouth and head area. Jefferson called 911, and Tipton was transported to High Point Regional Hospital by EMS where he was pronounced dead at 11:09 a.m.

An autopsy was performed by the Office of the Chief Medical Examiner (the "OCME"). The autopsy noted that Tipton had "contusions on the right head, left face, anterior neck, left anterior abdomen, and abrasions on the bilateral knees" as well as bruising on his buttocks. The OCME determined Tipton's cause of death to be oxymorphone poisoning and stated that Tipton's physical injuries were "superficial or mild in nature and did not contribute to death." Jefferson was unable to offer any explanation in his deposition testimony for the origin of the injuries to Tipton's head and face. The autopsy did not indicate the presence of alcohol in Tipton's body.

Cyril Wecht, a forensic pathologist hired by Tipton's family, reached a different determination based upon his analysis of the autopsy report. Wecht concluded that

Tipton died from "aspiration of gastrointestinal contents, most likely precipitated by blunt force trauma of his head that produced a concussion." In his report, Wecht also noted that "the levels of drugs set forth in the toxicology report were not . . . high enough to be considered lethal or even significantly toxic."

On 26 March 2012, after learning of Tipton's death Qubein went to Jefferson's apartment and took possession of Tipton's cell phone. He proceeded to delete various texts and photographs from the phone. He later testified that the messages and images he deleted concerned activity that "the school would consider to be hazing" and that he did so in order "to protect the fraternity." The messages and photographs deleted by Qubein were never recovered. In addition, following Tipton's memorial service at his home in Memphis, Tennessee, Qubein entered Tipton's bedroom without permission and deleted from his computer "[w]hatever came up that [he] thought needed to be deleted."

Deborah Dunklin Tipton, individually and in her capacity as the administrator of Tipton's estate ("Plaintiff"), filed the Wrongful Death Action in Guilford County Superior Court on 13 March 2015. With regard to the Fraternity, the complaint asserted claims against it based on several different legal theories but all premised on the proposition that the Fraternity had failed to take appropriate action to prevent hazing at the HPU Chapter. On 19 May 2016, the trial court dismissed the claims asserted against the Fraternity for fraud, constructive fraud, and negligent

misrepresentation. The Fraternity subsequently filed a motion for summary judgment pursuant to Rule 56 of the North Carolina Rules of Civil Procedure and an amended motion on 22 May 2017 as to the remaining claims asserted against it.

The Fraternity's motion was heard on 18 September 2017 before the Honorable Michael D. Duncan. On 6 October 2017, the trial court entered an order granting summary judgment in favor of the Fraternity. Plaintiff filed a motion to amend the summary judgment order to include language certifying the order for immediate appeal pursuant to Rule 54(b) of the North Carolina Rules of Civil Procedure. The trial court granted the motion and entered an amended summary judgment order on 29 December 2017. On 26 January 2018, Plaintiff filed a notice of appeal to this Court.

**Analysis**

**I. Appellate Jurisdiction**

As an initial matter, we must determine whether we have appellate jurisdiction to hear this appeal. *See Duval v. OM Hospitality, LLC*, 186 N.C. App. 390, 392, 651 S.E.2d 261, 263 (2007) ("[W]hether an appeal is interlocutory presents a jurisdictional issue, and this Court has an obligation to address the issue *sua sponte*." (citation, quotation marks, and brackets omitted)). "A final judgment is one which disposes of the cause as to all the parties, leaving nothing to be judicially determined between them in the trial court." *Id.* (citation omitted). Conversely, an

order or judgment is interlocutory if it does not settle all of the issues in the case but rather "directs some further proceeding preliminary to the final decree." *Heavner v. Heavner*, 73 N.C. App. 331, 332, 326 S.E.2d 78, 80, *disc. review denied*, 313 N.C. 601, 330 S.E.2d 610 (1985).

"Generally, there is no right of immediate appeal from interlocutory orders and judgments." *Paradigm Consultants, Ltd. v. Builders Mut. Ins. Co.*, 228 N.C. App. 314, 317, 745 S.E.2d 69, 72 (2013) (citation and quotation marks omitted). The prohibition against interlocutory appeals "prevents fragmentary, premature and unnecessary appeals by permitting the trial court to bring the case to final judgment before it is presented to the appellate courts." *Russell v. State Farm Ins. Co.*, 136 N.C. App. 798, 800, 526 S.E.2d 494, 496 (2000) (citation and brackets omitted).

> However, there are two avenues by which a party may immediately appeal an interlocutory order or judgment. First, if the order or judgment is final as to some but not all of the claims or parties, and the trial court certifies the case for appeal pursuant to N.C. Gen. Stat. § 1A-1, Rule 54(b), an immediate appeal will lie. Second, an appeal is permitted under N.C. Gen. Stat. §§ 1-277(a) and 7A-27(d)(1) if the trial court's decision deprives the appellant of a substantial right which would be lost absent immediate review.

*N.C. Dep't of Transp. v. Page*, 119 N.C. App. 730, 734, 460 S.E.2d 332, 334 (1995) (internal citations omitted). Rule 54(b) of the North Carolina Rules of Civil Procedure provides, in pertinent part, that "[w]hen more than one claim for relief is presented in an action . . . the court may enter a final judgment as to one or more but fewer than

all of the claims or parties only if there is no just reason for delay and it is so determined in the judgment." N.C. R. Civ. P. 54(b).

In the present case, the trial court's amended summary judgment order entered on 29 December 2017 was not a final judgment because it did not dispose of all of the claims asserted by Plaintiff against the remaining defendants. However, in the amended order, the trial court certified its ruling for immediate appeal pursuant to Rule 54(b). Therefore, we are satisfied that this appeal is properly before us. *See Eastover Ridge, L.L.C. v. Metric Constructors, Inc.*, 139 N.C. App. 360, 364, 533 S.E.2d 827, 831, *disc. review denied*, 353 N.C. 262, 546 S.E.2d 93 (2000) (appellate jurisdiction existed where "trial court certified that there is no just reason for delaying the appeal pursuant to Rule 54(b)").

## II. Entry of Summary Judgment

Plaintiff asserts that the trial court erred in granting summary judgment in favor of the Fraternity because (1) the Fraternity assumed a duty of care toward Tipton and the other pledges of the HPU Chapter by actively engaging in a course of conduct designed to recruit new members; (2) it breached that duty by failing to exercise reasonable care to ensure that no hazing occurred during the pledging process of the HPU Chapter; and (3) this breach was a proximate cause of Tipton's death.

The Fraternity, conversely, contends that it did not owe Tipton a duty of care because it lacks control over the day-to-day actions of its local chapters and their members. In addition, the Fraternity argues that Plaintiff has failed to offer evidence that any negligent conduct on its part was a proximate cause of Tipton's death.

After a careful review of the record and applicable law, we conclude that the entry of summary judgment was proper. Even assuming, without deciding, that such a duty of care on the part of the Fraternity existed, Plaintiff has failed to establish the existence of a genuine issue of material fact with regard to the question of whether Tipton's death was proximately caused by the Fraternity's negligence.

"On an appeal from an order granting summary judgment, this Court reviews the trial court's decision *de novo.  Mitchell, Brewer, Richardson, Adams, Burge & Boughman v. Brewer*, __ N.C. App. __, __, 803 S.E.2d 433, 443 (2017) (citation and quotation marks omitted), *disc. review denied*, 370 N.C. 693, 811 S.E.2d 161 (2018). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." *Premier, Inc. v. Peterson,* 232 N.C. App. 601, 605, 755 S.E.2d 56, 59 (2014) (citation and quotation marks omitted).

It is well established that "[t]he moving party has the burden of demonstrating the lack of any triable issue of fact and entitlement to judgment as a matter of law.

The evidence produced by the parties is viewed in the light most favorable to the non-moving party." *Hardin v. KCS Int'l, Inc.,* 199 N.C. App. 687, 695, 682 S.E.2d 726, 733 (2009) (internal citations omitted). We have held that "[a]n issue is 'genuine' if it can be proven by substantial evidence and a fact is 'material' if it would constitute or irrevocably establish any material element of a claim or a defense." *In re Alessandrini*, 239 N.C. App. 313, 315, 769 S.E.2d 214, 216 (2015) (citation omitted).

Our Supreme Court has held that actionable negligence is the "failure to exercise that degree of care which a reasonable and prudent person would exercise under similar conditions. A defendant is liable for his negligence if the negligence is the proximate cause of injury to a person to whom the defendant is under a duty to use reasonable care." *Hart v. Ivey*, 332 N.C. 299, 305, 420 S.E.2d 174, 177-78 (1992) (citation omitted). "Proximate cause is defined as a cause which in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries, and without which the injuries would not have occurred." *Young By and Through Young v. Fun Servs.—Carolina, Inc.*, 122 N.C. App. 157, 159, 468 S.E.2d 260, 262 (citation and quotation marks omitted), *disc. review denied*, 344 N.C. 444, 476 S.E.2d 134 (1996).

As a general proposition, "[s]ummary judgment is seldom appropriate in a negligence action. A trial court should only grant such a motion where the plaintiff's forecast of evidence fails to support an essential element of the claim." *Hamby v.*

*Thurman Timber Co., LLC,* __ N.C. App. __, __, 818 S.E.2d 318, 323 (2018) (citation and quotation marks omitted). Nevertheless, "[n]egligence is not presumed from the mere fact of injury." *Jackson v. Neill McKay Gin Co.*, 255 N.C. 194, 196, 120 S.E.2d 540, 542 (1961). Instead, it is well established that "a plaintiff is required to offer legal evidence tending to establish beyond mere speculation or conjecture every essential element of negligence, and upon failure to do so, summary judgment is proper." *Hamby*, __ N.C. App. at __, 818 S.E.2d at 323 (citation, quotation marks, and brackets omitted).

On a number of occasions, this Court has upheld the dismissal of negligence claims as a matter of law at the summary judgment or directed verdict stage based on a lack of evidence that the defendant's conduct had proximately caused the plaintiff's injury. For example, in *Gibson v. Ussery*, 196 N.C. App. 140, 675 S.E.2d 666 (2009), the plaintiff brought a negligence action after falling down an unfinished stairway on the defendants' property. *Id.* at 141, 675 S.E.2d at 667. At trial, evidence was presented that the plaintiff "did not appear to trip on anything." *Id.* at 144, 675 S.E.2d at 668. In addition, the plaintiff "was one of several to descend the staircase, but the only one to fall" and "none of the witnesses noticed any problems with the condition of the staircase as they descended." *Id.* Although a witness testified that one of the stairs wobbled under her foot after she went back to inspect the staircase following the plaintiff's fall, "there was no testimony about which stair [the plaintiff]

fell on and no testimony that anyone observed what caused her to fall." *Id.* The trial court granted the defendants' motion for directed verdict, and the plaintiff appealed. *Id.* at 142, 675 S.E.2d at 667.

This Court affirmed the trial court's entry of a directed verdict, concluding as follows:

> In evaluating the record, we look for evidence that takes the element of proximate cause out of the realm of suspicion. All of the testimony . . . provides no more than mere speculation that defendants' alleged negligence was the proximate cause of Cynthia's fall and the injuries that may have resulted from it. Doubtless Cynthia was injured in some manner as a result of her fall, but there is insufficient evidence to support a reasonable inference that the injury was the result of defendants' negligence.

*Id.* at 144, 675 S.E.2d 668-69.

*Elm St. Gallery, Inc. v. Williams*, 191 N.C. App. 760, 663 S.E.2d 874, *disc. review denied*, 362 N.C. 680, 670 S.E.2d 231 (2008), involved a building fire of unknown origin. *Id.* at 766, 663 S.E.2d at 878. In that case, the plaintiffs filed a lawsuit alleging that the owners of an adjoining building had "negligently maintained their building in such a condition that caused or contributed to the start and spread of the fire." *Id.* at 762, 663 S.E.2d at 875. Although the fire inspector's investigation revealed "three generations of electrical wiring design within the building[,]" the inspector "did not find any prevalent indications of an electrical cause of the fire. However, with the extent of fire damage he could not determine that this fire was not

electrical in nature." *Id.* at 766, 663 S.E.2d at 878 (quotation marks and brackets omitted). The fire inspector ultimately listed the cause of the fire as "undetermined." *Id.* The trial court granted the defendants' motion for summary judgment. *Id.* at 762, 663 S.E.2d at 878.

In affirming the trial court's ruling, this Court stated the following with regard to the issue of proximate cause:

> [P]roof of the burning alone is not sufficient to establish liability, for if nothing more appears, the presumption is that the fire was the result of accident or some providential cause. There can be no liability without satisfactory proof, by either direct or circumstantial evidence, not only of the burning of the property in question but that it was the proximate result of negligence and did not result from natural or accidental causes.

*Id.* at 764-65, 663 S.E.2d at 877 (citation omitted). We determined that the plaintiff's "assertion that the evidence points to an electrical fire . . . is a mere conjecture, surmise and speculation as to the cause of the fire" given the fire inspector's inability to determine the fire's origin. *Id.* at 766, 663 S.E.2d at 878 (citation, quotation marks, and brackets omitted).

Similarly, in *Young* the trial court granted summary judgment for the defendant where the plaintiff's evidence concerning proximate causation failed to raise a factual dispute requiring resolution by a jury. *Young*, 122 N.C. App. at 161, 468 S.E.2d at 263. In that case, the plaintiff — a 12 year-old child — was injured while jumping in a "moonwalk" operated by the defendant. *Id.* at 158, 468 S.E.2d at

261. Prior to the child's injury, the plaintiff's mother observed the moonwalk "slid[e] across the floor to the point that [the defendant's employee] had to move the moonwalk back to its original position." *Id.* The plaintiff filed a lawsuit alleging that the defendant had negligently failed to secure the moonwalk. *Id.*

This Court affirmed the trial court's grant of summary judgment for the defendant, noting that the plaintiff's mother "stated that she had no personal knowledge of how [plaintiff's] accident occurred, since she did not witness the accident." *Id.* at 161, 468 S.E.2d at 263. We concluded as follows:

> Nothing in the record demonstrates that the moonwalk shifted immediately before Kevin's accident. Nothing in the record allows the inference that a shifting of the moonwalk caused Kevin's accident. The mere fact that the moonwalk shifted earlier in the day, without more, is not enough to satisfy our Supreme Court's definition of proximate cause[.]

*Id.*

While *Gibson*, *Elm St. Gallery, Inc.*, and *Young* are all factually dissimilar to the present case, they are nevertheless instructive in providing examples of negligence-based claims that failed as a matter of law due to the plaintiffs' inability to raise a genuine issue of material fact on the element of proximate cause. Moreover, they aptly demonstrate that proximate cause cannot be established through mere conjecture.

Here, no evidence was presented concerning the manner in which Tipton sustained the head trauma that — according to Plaintiff's expert witness — was the cause of his death. Nor was there any evidence specifically linking Jefferson or his apartment with hazing activity. Although Reece testified in his deposition that hazing took place at the homes of Qubein and other members of the fraternity, he was unable to recall any hazing at Jefferson's residence.

Without evidence providing *some* actual link between actions taken by Jefferson (or other members of the HPU Chapter) and Tipton's head trauma, testimony merely showing that members of the HPU Chapter had previously hazed Tipton (along with his fellow pledges) during the pledging period in ways that would not logically cause injury to his head is simply not sufficient to meet Plaintiff's burden at the summary judgment stage.[1] Rather, such testimony fails to rise above the level of "mere speculation" that hazing was the cause of Tipton's death. *Gibson*, 196 N.C. App. at 144, 675 S.E.2d at 669. Thus, we are satisfied that the trial court did not err in granting the Fraternity's motion for summary judgment. *See Young*, 122 N.C. App. at 161, 468 S.E.2d at 263 (entry of summary judgment for defendant was proper where "an essential element of plaintiffs' claim was lacking — proximate cause").

---

[1] We note that none of the evidence suggests that Tipton or his fellow pledges were ever beaten on the head during the pledging period. To the contrary, the only evidence that exists in the record of hazing in the form of physical abuse against Tipton's pledge class is testimony that Tipton and his fellow pledges were each struck three times on the buttocks with a wooden paddle during "Hell Week."

In arguing that a genuine issue of material fact exists as to whether Tipton's head injuries were the result of hazing, Plaintiff directs our attention to several pieces of evidence, including (1) the existence of bruises on Tipton's knees and buttocks that Plaintiff contends are consistent with him having been paddled while in a kneeling position; (2) the apology text message sent by Tipton to the other members of his pledge class during the early morning hours of 26 March 2012; and (3) the fact that hazing had previously occurred in the homes of Qubein and various other HPU Chapter members in the form of pledges being required to perform physical exercises and clean the residences.

Taken together, however, this evidence still does not shed any light on the specific cause of Tipton's head trauma. With regard to the bruising present on Tipton's knees and buttocks, even if these bruises resulted from him being paddled on those areas of his body at some point during the pledging process, the occurrence of such paddling would provide no explanation for the presence of his head wounds on the night of his death. Nor does the fact that Tipton sent a text apologizing to the other pledges for perceived mistakes on his part support the inference that he was hazed that night while in Jefferson's apartment.

In addition, the fact that pledges had on occasion been required to perform strenuous exercises and clean the residences of various members of the HPU Chapter does not — without more — allow for a rational inference that pledges such as Tipton

were subjected to physical abuse on such occasions or that any form of hazing occurred in Jefferson's apartment on the night of Tipton's death. Moreover, it is undisputed that on the night of Tipton's death no fraternity-related activities were scheduled. In short, Plaintiff has failed to offer *any* evidence (1) as to the manner in which Tipton suffered trauma to his head; or (2) supporting the proposition that his head injury resulted from hazing-related activities.

Finally, Plaintiff argues that the doctrine of spoliation applies with regard to Qubein's actions in deleting messages and photographs from Tipton's cell phone and computer after his death. This Court has held that "when the evidence indicates that a party is aware of circumstances that are likely to give rise to future litigation and yet destroys potentially relevant records without particularized inquiry, a factfinder may reasonably infer that the party probably did so because the records would harm its case." *McLain v. Taco Bell Corp.*, 137 N.C. App. 179, 187-88, 527 S.E.2d 712, 718 (citation and brackets omitted), *disc. review denied*, 352 N.C. 357, 544 S.E.2d 563 (2000).

We are unable to agree with Plaintiff that the spoliation doctrine applies as against the Fraternity on these facts. Although Qubein stated that he deleted items from Tipton's phone and computer to "protect the fraternity," he further explained that he deleted evidence of activity that "the school would consider to be hazing." Nowhere in Qubein's testimony did he contend that he was acting on behalf of — or

for the benefit of — the *national* fraternity. Indeed, the Fraternity submitted an affidavit stating that "[a]s a policy, [the Fraternity] does not provide the authority or consent to any of its chapters or its members to act on its behalf." Nor has Plaintiff cited any evidence in the record to the contrary as to this issue.

Thus, Plaintiff has failed to offer any evidence that Qubein's conduct was intended to protect anyone other than the HPU Chapter or that his actions were undertaken at the direction of the Fraternity. It is axiomatic that an inference of spoliation cannot exist against a defendant who had no knowledge that the person who destroyed evidence was engaging in such conduct and where no relationship actually existed between that person and the defendant. *See generally Panos v. Timco Engine Ctr., Inc.*, 197 N.C. App. 510, 521, 677 S.E.2d 868, 876 (2009) ("[S]poliation of evidence permits an inference that the destroyed evidence was unfavorable *to the party that destroyed it*[.]" (emphasis added)). Thus, while an adverse inference might exist against Qubein, it would not extend to the Fraternity.

\* \* \*

In the final analysis, even taking all of the reasonable inferences from the evidence in the light most favorable to Plaintiff, vital links in the causation chain remain absent in terms of connecting the alleged negligence of the Fraternity to Tipton's death. We wish to emphasize, however, that in no way should our holding in this case be read as a retreat from the well-established principle that the issue of

proximate causation is ordinarily left for the jury to decide, and that "[i]t is only in exceptional cases, in which reasonable minds cannot differ . . . that a court should decide proximate cause as a matter of law." *Holt v. N.C. Dep't of Transp.*, 245 N.C. App. 167, 180, 781 S.E.2d 697, 706 (citation and quotation marks omitted), *aff'd per curiam*, 369 N.C. 57, 791 S.E.2d 458 (2016). We are satisfied that the present appeal represents just such an exceptional case. Accordingly, we affirm the trial court's order granting summary judgment in favor of the Fraternity. *See Gibson*, 196 N.C. App. at 146, 675 S.E.2d at 670 (summary judgment was appropriate in negligence action where "there is no evidence beyond mere conjecture and speculation that defendants' negligence was the proximate cause of [the plaintiff's] fall and her injuries").

## Conclusion

For the reasons stated above, we affirm the trial court's 29 December 2017 order.

AFFIRMED.

Judges BRYANT and INMAN concur.