IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA18-978

 Filed: 3 December 2019

Wake County, No. 17 CVS 6465

ROY A. COOPER, III, individually and in his official capacity as GOVERNOR OF
THE STATE OF NORTH CAROLINA, Plaintiff,

 v.

PHILIP E. BERGER, in his official capacity as PRESIDENT PRO TEMPORE OF
THE NORTH CAROLINA SENATE; TIMOTHY K. MOORE, in his official capacity
as SPEAKER OF THE NORTH CAROLINA HOUSE OF REPRESENTATIVES;
CHARLTON L. ALLEN, in his official capacity as CHAIR OF THE NORTH
CAROLINA INDUSTRIAL COMMISSION; and YOLANDA K. STITH, in her official
capacity as VICE-CHAIR OF THE NORTH CAROLINA INDUSTRIAL
COMMISSION, Defendants.

 Appeal by Plaintiff from an order and judgment entered 9 April 2018 by Judge

Henry W. Hight, Jr. in Wake County Superior Court. Heard in the Court of Appeals

15 October 2019.

 BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, L.L.P., by
 Daniel F. E. Smith, Jim W. Phillips, Jr., and Eric M. David, for Plaintiff-
 Appellant.

 NELSON MULLINS RILEY & SCARBOROUGH LLP, by D. Martin Warf and
 Noah H. Huffstetler, III, for Defendants-Appellees Philip E. Berger and
 Timothy K. Moore.

 No briefs filed by Charlton L. Allen and Yolanda K. Stith.

 INMAN, Judge.
 COOPER V. BERGER

 Opinion of the Court

 Plaintiff-Appellant Roy A. Cooper, III, the Governor of North Carolina, appeals

from an order and judgment dismissing his claim challenging the General Assembly’s

appropriation of federal block grant funds awarded to the State in a manner

inconsistent with the Governor’s recommended budget. The Governor contends the

federal funds are not within the General Assembly’s constitutional authority to

control, and that the General Assembly has interfered with the Governor’s

constitutional duty to faithfully execute the law.

 After careful review, and with the benefit of ample and able briefing and

argument from the parties, we hold that the block grant funds are, despite their

source in the federal government, subject to appropriation by the General Assembly.

We affirm the trial court.

 FACTUAL AND PROCEDURAL HISTORY

 The record below shows the following:

 In 2017, the Governor filed suit against Defendants-Appellees Philip E. Berger,

President Pro Tempore of the North Carolina Senate, and Timothy K. Moore, Speaker

of the North Carolina House of Representatives (the “Legislative Defendants”),

challenging the constitutionality of two session laws and six statutes.1 While those

claims were pending, the Governor and the General Assembly continued in the

 1 Charlton Allen and Yolanda K. Stith were also named as defendants; however, because they
have not entered an appearance in this appeal and the order and judgment at issue here does not
involve any claims against them, we omit them from further discussion in this opinion.

 -2-
 COOPER V. BERGER

 Opinion of the Court

execution of their duties, which included the preparation of the State budget for the

2017-2019 biennium. The Governor submitted a recommended budget proposing,

among other things, specific allocations of various federal block grant funds awarded

to North Carolina. Those federal block grants included the Community Development

Block Grant (“CDBG”), the Maternal and Child Health Block Grant (“MCHBG”), and

the Substance Abuse Prevention and Treatment Block Grant (“SABG,” collectively

with the CDBG and MCHBG as the “Block Grants”).

 The General Assembly disagreed with the Governor’s proposed allocations of

the Block Grants and passed the State budget as Session Law 2017-57 on 28 June

2017, which altered the allocations as follows:

 [SPACE INTENTIONALLY LEFT BLANK]

 -3-
 COOPER V. BERGER

 Opinion of the Court

 Community Development Grant
 Item Governor’s Budget S.L. 2017-57 Difference
 Scattered Site Housing $10,000,000 $0 ($10,000,000)
 Neighborhood Revitalization $0 $10,000,000 $10,000,000
 Economic Development $13,737,500 $10,737,500 ($3,000,000)
 Infrastructure $18,725,000 $21,725,000 $3,000,000

 Substance Abuse Grant
 Item Governor’s Budget S.L. 2017-57 Difference
 Substance Abuse Services – $29,322,717 $27,722,717 ($1,600,000)
 Treatment for
 Children/Adults
 Competitive Block Grant $0 $1,600,000 $1,600,000

 Maternal and Child Health Grant
 Item Governor’s Budget S.L. 2017-57 Difference
 Women and Children’s $14,070,680 $11,802,435 ($2,268,245)
 Health Services
 Every Week Counts2 $0 $2,200,000 $2,200,000
 Perinatal Strategic Plan $0 $68,245 $68,245
 Support Position

See 2017 N.C. Sess. Laws 57 §§ 11A.14.(a), 11L.1.(a), 11L.1.(y)-(z), 11L.1.(aa)-(ee),

15.1.(a), 15.1.(d) (collectively, the “Block Grant Appropriations”).

 In response to passage of the State budget, the Governor amended his

complaint to add a claim challenging the constitutionality of the Block Grant

Appropriations. This new claim asserted that the “Block Grant Appropriations are

unconstitutional because they prevent the Governor from performing his core

 2 Every Week Counts is “a demonstration project in two counties . . . of North Carolina to study
(i) the extent to which a home-based prenatal care model can reduce the rate of preterm birth among
multiparous women and (ii) whether multiparous women without a prior preterm birth, but with
multiple risk factors for preterm birth in the current pregnancy, may benefit from 17 Alpha-
Hydroxyprogesterone Caproate (17P) therapy.” 2017 N.C. Sess. Laws 57 § 11E.12.(a).

 -4-
 COOPER V. BERGER

 Opinion of the Court

function under [Article III, Section 5(4) of] the North Carolina Constitution to ‘take

care that the laws be faithfully executed[,]” and, “[t]o the extent the Block Grant

Appropriations are part of the State budget, they also violate Article III, Section 5(3)

of the North Carolina Constitution because they encroach on the Governor’s duty to

administer the budget.”3

 The Legislative Defendants filed a combined motion to dismiss and answer to

the Governor’s amended complaint. The Governor then filed a motion for partial

summary judgment and permanent injunction declaring the Block Grant

Appropriations unconstitutional “as applied in this case[.]” Two days later, the

Legislative Defendants filed a motion for judgment on the pleadings as to that same

claim. After briefing and argument, Judge Henry W. Hight, Jr., entered a combined

order and judgment on 9 April 2018 resolving all motions in favor of the Legislative

Defendants.

 The trial court concluded that the federal block grant funds “are designated for

the State of North Carolina and will be paid into the State Treasury.” It also

concluded that “Article V, Section 7 of the Constitution unambiguously states that no

money can be drawn from the State Treasury without an appropriation[,]” and

 3 The Governor’s amended complaint also included a claim challenging additional portions of
Session Law 2017-57 related to the appropriation of settlement funds set aside for North Carolina as
part of a federal lawsuit against Volkswagen. Although review of that claim was originally part of this
appeal, we granted a motion, filed by the Governor, to dismiss that portion of the appeal. Our review
is therefore limited to the constitutionality of the Block Grant Appropriations.

 -5-
 COOPER V. BERGER

 Opinion of the Court

rejected the Governor’s argument that the federal block grants constitute “custodial

fund[s]” exempt from the constitutional and statutory budgetary and appropriations

processes as without precedent under state law. The trial court ultimately concluded

that: (1) the Governor failed to allege and forecast evidence “that the challenged

portions of Session Law 2017-57 violate his duty to take care that the laws be

faithfully executed or otherwise encroach on his duty to administer the budget;” and

(2) that, therefore, the challenged provisions of Session Law 2017-57 are not

unconstitutional.

 Judge Hight certified the order and judgment for immediate appeal pursuant

to Rule 54(b) of the North Carolina Rules of Civil Procedure. The Governor appeals.

 ANALYSIS

I. Appellate Jurisdiction

 In general, no right of immediate appeal from an interlocutory order exists.

Paradigm Consultants, Ltd. v. Builders Mutual Ins. Co., 228 N.C. App. 314, 317, 745

S.E.2d 69, 72 (2013).

 However, there are two avenues by which a party may
 immediately appeal an interlocutory order or judgment.
 First, if the order or judgment is final as to some but not
 all of the claims or parties, and the trial court certifies the
 case for appeal pursuant to N.C. Gen. Stat. § 1A–1, Rule
 54(b), an immediate appeal will lie. Second, an appeal is
 permitted under N.C. Gen. Stat. §§ 1–277(a) and 7A–
 27(d)(1) if the trial court's decision deprives the appellant
 of a substantial right which would be lost absent
 immediate review.

 -6-
 COOPER V. BERGER

 Opinion of the Court

N.C. Dep’t of Transp. v. Page, 119 N.C. App. 730, 734, 460 S.E.2d 332, 334 (1995)

(citations omitted). Because the order and judgment at issue in this case was final

as to the Governor’s challenge to the Block Grant Appropriations and certified by the

trial court for immediate appeal pursuant to Rule 54(b), we possess jurisdiction to

hear the Governor’s appeal. See, e.g., Estate of Tipton By & Through Tipton v. Delta

Sigma Phi Fraternity, Inc., ___ N.C. App. ___, ___, 826 S.E.2d 226, 231-32 (2019)

(holding a grant of partial summary judgment on less than all claims was subject to

immediate appeal when the order contained a Rule 54(b) certification).

II. Standard of Review

 A trial court’s entry of judgment on the pleadings—or of summary judgment—

is subject to de novo review on appeal. See N.C. Concrete Finishers, Inc. v. N.C. Farm

Bureau Mut. Ins. Co., 202 N.C. App. 334, 336, 688 S.E.2d 534, 535 (2010)

(acknowledging de novo review applies to entry of judgment on the pleadings); In re

Will of Jones, 362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008) (“Our standard of review

of an appeal from summary judgment is de novo[.]” (citation omitted)). “Judgment

on the pleadings is properly entered only if ‘all the material allegations of fact are

admitted[,] . . . only questions of law remain,’ and no question of fact is left for jury

determination.” N.C. Concrete Finishers, 202 N.C. App. at 336, 688 S.E.2d at 535

(quoting Ragsdale v. Kennedy, 286 N.C. 130, 137, 209 S.E.2d 494, 499 (1974))

(alteration in original). Summary judgment “is appropriate only when the record

 -7-
 COOPER V. BERGER

 Opinion of the Court

shows that there is no genuine issue as to any material fact and that any party is

entitled to a judgment as a matter of law.” Jones, 362 N.C. at 573, 669 S.E.2d at 576

(citation and internal quotation marks omitted).

 Our Supreme Court has recently explained the standard of review for

constitutional questions:

 We review constitutional questions de novo. In exercising
 de novo review, we presume that laws enacted by the
 General Assembly are constitutional, and we will not
 declare a law invalid unless we determine that it is
 unconstitutional beyond reasonable doubt. In other words,
 the constitutional violation must be plain and clear. To
 determine whether the violation is plain and clear, we look
 to the text of the constitution, the historical context in
 which the people of North Carolina adopted the applicable
 constitutional provision, and our precedents.

State ex rel. McCrory v. Berger, 368 N.C. 633, 639, 781 S.E.2d 248, 252 (2016)

(citations and quotations omitted).

III. Historical and Legislative Context

 The Governor’s appeal presents an as-applied constitutional challenge to the

Block Grant Appropriations identified in his complaint, but it turns on a broader

constitutional issue of first impression: whether the North Carolina Constitution

permits the General Assembly to appropriate federal funds designated to the State

through federal block grants. This Court has not previously been presented with this

issue. Our Supreme Court was presented with—and declined to answer—this exact

query in Advisory Opinion In re Separation of Powers, 305 N.C. 767, 779, 295 S.E.2d

 -8-
 COOPER V. BERGER

 Opinion of the Court

589, 594-95 (1982). There, the Supreme Court demurred because “[t]he briefs and

materials submitted to us contain very little, if any, information about the grants,

their purposes, for whom they are intended, and the conditions placed on them by

Congress.” Id.

 We are not so bereft of congressional context here, however, and, as pointed

out by both parties, other states’ supreme courts have squarely resolved the issue by

considering their respective constitutions and looking to the texts, nature, purposes,

and contours of the block grants at issue and the federal grants-in-aid regime

generally. Compare Colorado General Assembly v. Lamm, 738 P.2d 1156 (Colo. 1987)

(surveying the federal block grant landscape and examining the terms and conditions

of eight specific federal block grants, including the Block Grants at issue here, before

holding that each was not subject to appropriation by the state’s legislature under

Colorado’s constitution), with Shapp v. Sloan, 480 Pa. 449, 391 A.2d 595 (1978)

(holding federal block grant funds were subject to appropriation by Pennsylvania’s

legislature under the state’s constitution in part because Congress’s authorizing

legislation did not suggest the contrary).

A. Federal Grants-In-Aid

 For the first half of the twentieth century, the federal government operated a

relatively small grants-in-aid system as compared to current standards. See Shapp,

480 Pa. at 466, 391 A.2d at 603 (noting that federal aid to states grew from $2.9 billion

 -9-
 COOPER V. BERGER

 Opinion of the Court

in 1954 to $60 billion in 1976); Robert Jay Dilger & Michael H. Cecire, Cong. Research

Serv., R40638, Federal Grants to State and Local Governments: A Historical

Perspective on Contemporary Issues 39 (2019) (hereinafter “Federal Grants”)

(observing that President Donald Trump’s budget request for fiscal year 2020

“estimates that total outlays for grants to state and local governments will increase

from $696.5 billion in FY2018 to an anticipated $749.5 billion in FY2019 and $750.7

billion in FY2020”).4 President Lyndon Johnson’s “Great Society” platform enacted

during the 1960s expanded federal funding for states; the number of federal grants-

in-aid tripled between 1960 and 1968, and “[m]ost . . . were designed purposively by

Congress to encourage state and local governments to move into new policy areas, or

to expand efforts in areas identified by Congress as national priorities.” Federal

Grants at 21-22. The grants were generally structured to provide “an increased

emphasis on narrowly focused project, categorical grants to ensure that state and

local governments were addressing national needs.” Id. at 22. These categorical

grants are the most restrictive form of federal grants-in-aid:

 4 The Congressional Research Service’s “primary function is to respond to congressional
research requests[,]” Bowsher v. Synar, 478 U.S. 714, 758, 92 L. Ed. 2d 583, 616, n.25 (1986) (Stevens,
J., concurring), and the Service is tasked with carrying out its statutory duties “without partisan
bias[.]” 2 U.S.C. § 166(d) (2018). Other courts frequently cite to the Service’s reports to provide
historical or other context when addressing legal issues. See, e.g., United States v. Valdovinos, 760
F.3d 322, 331 (4th Cir. 2014) (citing to Congressional Research Service reports for “some necessary
and useful background” on incarceration); CompuCredit Corp. v. Greenwood, 565 U.S. 95, 103, 181 L.
Ed. 2d 586, 596 (2012) (citing a Congressional Research Service report for the proposition that the use
of arbitration clauses in consumer contracts rose during the early 1990s). Both parties in this case
cite to a Congressional Research Service report in their appellate briefs to provide general background
information on federal block grants.

 - 10 -
 COOPER V. BERGER

 Opinion of the Court

 [P]roject categorical grants typically impose the most
 restraint on recipients . . . . Federal administrators have a
 high degree of control over who receives project categorical
 grants (recipients must apply to the appropriate federal
 agency for funding and compete against other potential
 recipients who also meet the program’s specified eligibility
 criteria); recipients have relative little discretion
 concerning aided activities (funds must be used for
 narrowly specified purposes); and there is a relatively high
 degree of federal administrative conditions attached to the
 grant, typically involving the imposition of federal
 standards for planning, project selection, fiscal
 management, administrative organization, and
 performance.

Robert Jay Dilger & Eugene Boyd, Cong. Research Serv., R40486, Block Grants:

Perspectives and Controversies 2 (2014) (hereinafter “Block Grants”).

 Despite Congress’s preference for categorical grants and the federal control

they offered during the 1960s, that decade also saw the creation of the first two

federal block grants. Federal Grants at 22. Block grants differ from categorical

grants in several key ways:

 Block grants are at the midpoint in the continuum of
 recipient discretion. Federal administrators have a low
 degree of discretion over who receives block grants (after
 setting aside funding for administration and other
 specified activities, the remaining funds are typically
 allocated automatically to recipients by a formula or
 formulas specified in legislation); recipients have some
 discretion concerning aided activities (typically, funds can
 be used for a specified range of activities within a single
 functional area); and there is a moderate degree of federal
 administrative conditions attached to the grant, typically
 involving more than periodic reporting criteria and the
 application of standard government accounting

 - 11 -
 COOPER V. BERGER

 Opinion of the Court

 procedures, but with fewer conditions attached to the grant
 than project categorical grants.

Block Grants at 3.

 As the expansion of the federal grants-in-aid system continued through the

1960s—largely through continued creation of restrictive categorical grants—there

“came ‘a rising chorus of complaints from state and local government officials’

concerning the inflexibility of fiscal and administrative requirements attached to the

grants.” Federal Grants at 23 (quoting Advisory Comm’n on Intergovernmental

Relations, Categorical Grants: Their Role and Design, A-52, 29 (1978), available at

https://library.unt.edu/gpo/acir/Reports/policy/a-52.pdf);5 see also Lamm, 738 P.2d at

1158-59 (noting that the Commission “suggested that federal assistance to the states

be restructured to allow revenue sharing and block grants in addition to categorical

grants.”). State governments found willing allies in the presidential administrations

of the 1970s, when Presidents Richard Nixon and Gerald Ford advocated for more

block grants and revenue sharing programs because “block grants and general

revenue sharing provided state and local governments additional flexibility in project

selection and promoted program efficiency by reducing administrative costs.” Federal

 5 The Advisory Commission on Intergovernmental Relations (“the Commission”) was created
by Congress as a “permanent bipartisan commission” whose purposes included “giv[ing] critical
attention to the conditions and controls involved in the administration of Federal grant programs” and
“recommend[ing], within the framework of the Constitution, the most desirable allocation of
governmental functions, responsibilities, and revenues among the several levels of government.” Act
of Sept. 24, 1959, Pub. L. No. 86-380 §§ 1-2, 73 Stat. 703, 703-04. The Commission was terminated by
an act of Congress in 1995. Independent Agencies Appropriations Act of 1996, Pub. L. No. 104-52, 109
Stat. 480, 480 (1995).

 - 12 -
 COOPER V. BERGER

 Opinion of the Court

Grants at 23. By 1976, the Commission “determined that state legislative control

over federal funds does not contravene federal policy and is, in fact, the desirable

mode of administration.” Shapp, 480 Pa. at 470, 391 A.2d at 605.

 President Ronald Reagan continued the push started by his Republican

predecessors to “increase the emphasis on block grants to provide state and local

government officials greater flexibility in determining how the program’s funds are

spent,” and, in 1981, Congress significantly altered the federal grants-in-aid system

by consolidating 77 categorical grants and two block grants into nine new block

grants as part of the Omnibus Budget Reconciliation Act of 1981 (“OBRA”). Federal

Grants at 28-29.6 In enacting OBRA, “Congress did not include . . . the comptroller

general’s recommendation that would have required state legislative appropriation

of the OBRA block grants[,]” and instead was simply “silent regarding the authority

of state legislatures to appropriate federal block grant funds[.]” Lamm, 738 P.2d at

1160.

 Despite OBRA’s shift from categorical grants towards block grants, Congress

passed only one of the 26 additional block grants President Reagan proposed over the

remainder of his two terms, Federal Grants at 30, and “[t]he emphasis on categorical

grants . . . continued” through the 1990s. Id. at 33. Block grants have nonetheless

become more common in the past two decades. Compare id. (counting four block

 6 The Block Grants at issue in this case were among the nine new block grants created in 1981.

 - 13 -
 COOPER V. BERGER

 Opinion of the Court

grants in existence as of 1980), with Block Grants at 5 (counting 23 federal block

grants as of 2014). As noted supra, the federal grants-in-aid system now totals in

excess of $740 billion; in North Carolina, federal grants-in-aid comprised 28.4 percent

of the State’s spending in fiscal year 2017. Federal Aid to State and Local

Governments, Center on Budget and Policy Priorities (Apr. 19, 2018),

https://www.cbpp.org/research/state-budget-and-tax/federal-aid-to-state-and-local-

governments.

B. The Block Grants

 Each of the Block Grants at issue in this appeal fits within the general

definition and structure of block grants as outlined supra.

 The Community Development Block Grant awards federal funds to state

government applicants who submit a consolidated plan for each program year,

including an action plan detailing how CDBG funds will be allocated. 24 C.F.R. §§

91.10, 91.300, 91.320, & 570.485(a) (2019). The consolidated plan must identify “[t]he

lead agency or entity responsible for overseeing the development of the plan.” 24

C.F.R. § 91.300(b)(1) (2019). In North Carolina, that agency is the Department of

Commerce (“N.C. DOC”). See N.C. Dep’t of Commerce et al., North Carolina 2016-

2020 Consolidated Plan and 2016 Annual Action Plan 3 (2016), available at

https://files.nc.gov/nccommerce/documents/Rural-Development-Division/CDBC/Con-

PlansCDBG/20162020-ConPlan.pdf (designating N.C. DOC as the “CDBG

 - 14 -
 COOPER V. BERGER

 Opinion of the Court

Administrator”). CDBG funds must be spent to benefit low- and moderate-income

persons, to prevent or eliminate slums or blight, or to meet urgent needs threatening

community health or welfare. 42 U.S.C. § 5304(b)(3) (2018). Congress has

enumerated 26 community development activities that can be funded by this block

grant. 42 U.S.C. § 5305(a) (2018). At least 70 percent of grant expenditures must

benefit low- or moderate-income persons. 24 C.F.R. § 570.484 (2019). Congress

prohibits States from using the funds for certain expenditures. See, e.g., 42 U.S.C. §

5305(h) (2018) (prohibiting the use of CDBG funds to assist in relocations of certain

industrial facilities).7

 The Maternal Child Health Block Grant operates similarly. State government

applicants request funds each year. 42 U.S.C. § 705 (2018). By statute, “[t]he State

health agency of each State shall be responsible for the administration (or supervision

of the administration) of programs carried out with [MCHBG] allotments.” 42 U.S.C.

§ 709(b) (2018). The North Carolina Department of Health and Human Services

(“N.C. DHHS”) administers these programs in North Carolina. The federal

government awards the funds “for the purpose of enabling each State . . . to provide

 7 A more detailed summary of the Community Development Block Grant and its requirements
is available from the U.S. Department of Housing and Urban Development (“HUD”), which
administers the CDBG at the federal level. See U.S. Dep’t of Hous. and Urban Dev., Office of Block
Grant Assistance, Basically CDBG for States (July 2014), available at
https://www.hudexchange.info/resource/269/basically-cdbg-for-states/. HUD’s guidance acknowledges
that states are responsible for “[s]etting priorities and deciding what activities to fund[,]” and, “[u]nder
the state CDBG program, states are provided maximum feasible deference.” Id. at 1-2.

 - 15 -
 COOPER V. BERGER

 Opinion of the Court

and to assure mothers and children (in particular those with low income or with

limited availability of health services) access to quality maternal and child health

services.” 42 U.S.C. § 701(a)(1)(A) (2018). Each state receiving funds must allocate

at least 30 percent toward preventive and primary care for children, at least 30

percent toward services for children with special needs, and no more than ten percent

toward administration of the grant; the remaining funds may be spent however the

state decides, consistent with the governing statutes and regulations. 42 U.S.C. §§

701(a)(1)(A), 704(a), 704(d) & 705(a)(3) (2018). MCHBG funds may not be spent in

particular ways, such as to purchase land. 42 U.S.C. § 704(b) (2018).8

 Congress also requires states to apply annually for the Substance Abuse Block

Grants. 42 U.S.C. § 300X-32(b)(1)(C); 45 C.F.R. § 96.122(g)(2) (2019). Applicants

must “identif[y] the single State agency responsible for the administration of the

program[,]” 42 U.S.C. 300x-32(b)(1)(A)(i) (2018), which, for North Carolina, is

currently N.C. DHHS. Recipients expend SABG funds within the framework of their

plans according to their discretion, with a minimum of 20 percent spent on substance

 8 The U.S. Department of Health and Human Services (“U.S. DHHS”) administers both the
Maternal Child Health Block Grant and the Substance Abuse Block Grant. A detailed breakdown of
the application, spending, and reporting requirements is available from the agency. U.S. Dep’t of
Health and Human Servs., Health Res. and Servs. Admin., Maternal and Child Health Bureau, Div.
of State and Cmty. Health, OMB No. 0915-0172 Title V Maternal and Child Health Services Block
Grant to States Program: Guidance and Forms for the Title V Application/Annual Report (expires Dec.
31, 2020), available at
https://grants6.tvisdata.hrsa.gov/uploadedfiles/Documents/blockgrantguidance.pdf.

 - 16 -
 COOPER V. BERGER

 Opinion of the Court

abuse prevention. 42 U.S.C. §§ 300x-21(b) & 300x-22(a)(1) (2018).9 As a prerequisite

to receiving these funds, each state must enact and enforce laws that prohibit the

sale or distribution of tobacco products to minors. 42 U.S.C. § 300x-26(a)(1) (2018).

No more than five percent of the grant may be used to administer the block grant, 45

C.F.R. § 96.135(b)(1) (2019), and states are prohibited from using SABG funds on six

specific activities. 45 C.F.R. § 96.135(a) (2019).

 In sum, while the Block Grants all impose certain restrictions and criteria for

the application, acceptance, and expenditure of their respective grant funds, each

affords significant discretion to the recipient states on how that money is ultimately

spent. See Eugene Boyd, Cong. Research Serv., R43520, Community Development

Block Grants and Related Programs: A Primer 1 (2014) (“Although . . . states are

given great discretion and flexibility in the selection of activities to be funded, the

[CDBG] program’s governing statute requires that all activities meet one of three

national objectives.”); Victoria L. Elliott, Cong. Research Serv., R44929, Maternal and

Child Health Services Block Grant: Background and Funding 13 (2017) (“Beyond . . .

broad requirements, states determine the actual services provided under the

 9 A fact sheet authored by U.S. DHHS discloses that outside of the 20 percent allocated toward
primary prevention, five percent of Substance Abuse Block Grant funds are set aside for federal data
collection purposes, an additional five percent must be spent by certain states on HIV treatment, and
“[t]he remainder . . . can be expended by the States . . . for substance abuse prevention, early
intervention, treatment and recovery support services at grantees’ discretion.” U.S. Dep’t of Health
and Human Services, Substance Abuse and Mental Health Services Admin., Fact Sheet: Substance
Abuse Prevention and Treatment Block Grant 2 (2013), available at
https://www.samhsa.gov/sites/default/files/sabg_fact_sheet_rev.pdf.

 - 17 -
 COOPER V. BERGER

 Opinion of the Court

[MCHBG] block grant.”); Erin Bagalman, Cong. Research Serv., R44510, Substance

Abuse and Mental Health Services Administration (SAMHSA): Agency Overview 2

(2016) (“States have flexibility in the use of SABG funds within the framework of the

state plan and federal requirements.”).

 According to affidavits in the record, the State of North Carolina receives and

expends federal grant funds through a process that is roughly uniform across each of

the Block Grants. Funds are held by the federal government up until N.C. DOC or

N.C. DHHS submits a discrete request tied to a given expenditure; in response, the

federal government remits the requested funds into an account in the name of the

North Carolina Department of State Treasurer (the “Treasurer”). The funds are

assigned a budget code tied to the State agency on receipt by the Treasurer, and the

agency submits a requisition to the Office of the State Controller to transfer the coded

funds to a disbursing account tied to the agency—also held and maintained by the

Treasurer. Those funds are then disbursed through a paper warrant or electronic

transfer, at which time they enter the hands of a sub-grantee, a third party, another

division within the agency, or are used to satisfy an administrative expense of the

agency itself.

C. State Expenditures Under The North Carolina Constitution

 The North Carolina Constitution provides that “[n]o money shall be drawn

from the State treasury but in consequence of appropriations made by law.” N.C.

 - 18 -
 COOPER V. BERGER

 Opinion of the Court

Const. art. V, § 7(1). The General Assembly’s primacy over State expenditures

embodied in this language dates to the genesis of the State. See John V. Orth and

Paul Martin Newby, The North Carolina State Constitution 154 (2d ed. 2013) (noting

that “[t]he power of the purse is the exclusive prerogative of the General Assembly[,]”

and “Subsection 1 dates from the 1776 constitution”). Legislative—rather than

executive—authority over the State’s expenditure of funds was intrinsic to the State’s

founding, as “Colonial Americans were acutely aware of the long struggle between

the English Parliament and the Crown over the control of public finance and were

determined to secure the power of the purse for their elected representatives.” Id.

The drafters of the State’s first constitution expressly made the Governor’s authority

over public funds subordinate to the General Assembly’s authority, while employing

language that recognized the appropriations power as a means of oversight. See N.C.

Const. of 1776, § XIX (“That the Governor, for the Time being, shall have Power to

draw for, and apply, such Sums of Money as shall be voted by the General Assembly

for the Contingencies of Government, and be accountable to them for the same.”

(emphasis added)).

 The language now found in Article V, Subsection 7(1) was first adopted in 1868.

N.C. Const. of 1868 art. XIV § 3. It remained unchanged until 1971, when the

provision was reorganized and restated in Article V without further alteration. N.C.

Const. of 1971 art. V § 7(1). Although the verbiage of the provision has evolved, its

 - 19 -
 COOPER V. BERGER

 Opinion of the Court

paramount importance has not: “It is the power of the purse, to which the power of

the sword is a mere sequence.” Wilmington & W.R. Co. v. Alsbrook, 110 N.C. 137,

145, 14 S.E. 652 (1892); see also White v. Hill, 125 N.C. 194, 200-01, 34 S.E. 432, 433-

34 (1899) (Clark, J., dissenting) (reviewing Article XIV, Section 3 of the 1868

Constitution and observing that “[t]he legislative power is supreme over the public

purse. . . . The power of the purse is essentially the supreme power, and by it alone

in England and in this country the power of the sword has been subordinated to the

civil power.”). Nor has the power been diverted from the legislature’s exclusive

control: “Article XIV, section 3, [now Article V, section 7], of the North Carolina

Constitution . . . states in language no man can misunderstand that the legislative

power is supreme over the public purse.” State v. Davis, 270 N.C. 1, 14, 153 S.E.2d

749, 758 (1967).

 Both the General Assembly and the Governor exercise certain constitutional

duties in crafting the State’s budget. Our Constitution provides that “[t]he Governor

shall prepare and recommend to the General Assembly a comprehensive budget of

the anticipated revenue and proposed expenditures of the State for the ensuing fiscal

period. The budget as enacted by the General Assembly shall be administered by the

Governor.” N.C. Const. art. III § 5(3). The General Assembly has, since at least 1981,

appropriated block grant funds through the budget process. See, e.g., 1981 N.C. Sess.

Laws ch. 1282 § 6 (appropriating $193,701,970 of federal block grant funds, including

 - 20 -
 COOPER V. BERGER

 Opinion of the Court

the Community Development Block Grant, Maternal Child Health Block Grant, and

Substance Abuse Block Grant for the 1982-83 fiscal year).

IV. The Block Grant Appropriations Are Constitutional

 The Governor asserts that the Block Grant funds are not within “the State

treasury” as used in Article V, Section 7, and therefore are not subject to

appropriation by the General Assembly. To support that claim, the Governor posits

that: (1) under North Carolina law, the only funds in “the State treasury” for

constitutional purposes are those raised by the State through taxation, fines, or

penalties; (2) Congress did not intend the General Assembly to have spending power

over the Block Grant funds; and (3) the funds are therefore “custodial funds” held by

the State to accomplish federal goals, and the Governor—not the General Assembly—

has exclusive authority to direct the funds outside the constitutional appropriation

and budgetary processes to further those aims. We address each point in turn.

A. The Block Grant Funds Are Within The State Treasury

 Our Supreme Court defined the term “State treasury” in Gardner v. Board of

Trustees of N.C. Local Governmental Employees’ Retirement System, 226 N.C. 465, 38

S.E.2d 314 (1946), and both parties seize on this decision to support or rebut any

conclusion that the Block Grant funds are outside the ambit of Article V, Section 7.

In Gardner, a Charlotte police officer was a member of the Law Enforcement Officers’

Benefit and Retirement Fund, which was established by statute, financed by a two

 - 21 -
 COOPER V. BERGER

 Opinion of the Court

dollar fee assessed against convicted criminal defendants, and held in a special fund

with the State Treasurer. 225 N.C. at 466-67, 38 S.E.2d at 315-16. The officer sought

membership in a second state retirement fund, the Local Governmental Employees’

Retirement System; however, that system’s enabling statute provided that “[p]ersons

who are . . . members of any existing retirement system and who are . . . entitled to

benefits . . . at the expense of funds drawn from the treasury of the State of North

Carolina . . . shall not be members.” Id. at 466, 38 S.E.2d at 315. The Local system

denied the officer membership, and he filed suit, ultimately arguing before the

Supreme Court that the prohibition did not apply because benefits under the Law

Enforcement fund were not paid out of the treasury’s general funds derived from

general taxation. Id. at 466-67, 38 S.E.2d at 315-16.

 The Supreme Court held that the Law Enforcement fund’s benefits were drawn

from the State treasury. Id. at 467-68, 38 S.E.2d at 316. The fact that the monies

were raised outside of the general taxation powers, set aside for a special purpose,

and kept in a separate account was not “controlling, since it is the duty of the State

Treasurer ‘to receive all monies which shall from time to time be paid into the

treasury of this state.’ ” Id. at 468, 38 S.E.2d at 316 (quoting N.C. Gen. Stat. § 147-

68 (1945)). The Supreme Court continued:

 And once in the treasury, “No money shall be drawn from
 the treasury but in consequence of appropriations made by
 law.” Moneys paid into the hands of the State Treasurer
 by virtue of a State Law become public funds for which the

 - 22 -
 COOPER V. BERGER

 Opinion of the Court

 Treasurer is responsible and may be disbursed only in
 accordance with legislative authority. A treasurer is one in
 charge of a treasury, and a treasury is a place where public
 funds are deposited, kept and disbursed.

Id. (quoting N.C. Const. of 1868, art. XIV § 3) (citing Webster’s Dictionary).10 Thus,

the State treasury is a depository of “public funds,” and “[m]oneys paid into the hands

of the State Treasurer by virtue of State Law become public funds[.]” Id.

 We are not persuaded that Gardner compels us to interpret or treat the Block

Grant funds as being outside “the State treasury” as used in Article V, Subsection

7(1). The Supreme Court’s definition of “public funds” in Gardner did not, by its plain

language, exclude sources of money other than State-levied taxes, fines, or penalties,

and, when read in context, expanded the sources of monies that constitute “public

funds” in the “State treasury.” Also, the federal Block Grant funds at issue here do,

strictly speaking, enter “into the hands of the State Treasurer by virtue of a State

Law.” Id. Neither party disputes that the Block Grant funds are received and

deposited in an account maintained by the Treasurer, a practice consistent with our

general statutes:

 All funds belonging to the State of North Carolina, in the
 hands of any head of any department of the State which
 collects revenue for the State in any form whatsoever, and
 every institution, agency, officer, employee, or
 representative of the State or any agency, department,

 10 It is unclear from the opinion which edition of Webster’s Dictionary the Supreme Court cited;
however, Merriam-Webster currently provides a substantively identical definition for “treasury.”
Treasury, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/treasury (last visited
Nov. 11, 2019).

 - 23 -
 COOPER V. BERGER

 Opinion of the Court

 division or commission thereof, except officers and the
 clerks of the Supreme Court and Court of Appeals,
 collecting or receiving any funds or money belonging to the
 State of North Carolina, shall daily deposit the same in
 some bank, or trust company, selected or designated by the
 State Treasurer, in the name of the State Treasurer.

N.C. Gen. Stat. § 147-77 (2019) (emphasis added).

 Finally, Gardner did not involve federal funds. There is no indication that the

Supreme Court in 1948 considered federal block grant funds in its analysis,

particularly given the facts before it. As the Supreme Court of Pennsylvania observed

in rejecting a substantially identical argument by its governor based on a

Pennsylvania decision from 1941:

 The Court in 1941 could not anticipate that another source
 of income would become available for wide-spread
 administration of programs on the State level, and that
 within three decades, federal funds would constitute a
 large portion of the budgets of most states in the union.

 ....

 In an age when state funds were provided almost entirely
 through state taxation, the [court in 1941] had no reason
 to foresee the vast impact that federal funding would
 eventually have on state fiscal matters. To interpret its
 choice of words as excluding such federal funds from state
 monies available for appropriation is as illogical as to
 exclude regulation of air traffic from the Congress’
 constitutional Commerce Clause powers because [it was]
 not mentioned or contemplated by the framers.

Shapp, 480 Pa. at 466-67, 391 A.2d at 603. Gardner is likewise distinguishable.

 - 24 -
 COOPER V. BERGER

 Opinion of the Court

 In short, Gardner is not controlling to our decision here, and, to the extent that

it is pertinent, its expansive reading of “State treasury” and “public funds” such that

non-tax dollars deposited in a special fund for a specific purpose are nonetheless

subject to appropriation suggests that the Block Grant funds are within the “State

treasury” for purposes of Article V, Subsection 7(1).

 The Governor also cites our Supreme Court’s decision in Garner v. Worth, 122

N.C. 250, 29 S.E. 364 (1898), describing the State Treasurer as “the officer in whose

hands the legislative department has placed the funds it has raised and

appropriated.” 122 N.C. at 256, 29 S.E. at 366. Garner, however, dealt only with the

question of whether the judiciary, by writ of mandamus, could compel the State

Treasurer to pay a judgment entered against the State without legislative

appropriation. Id. The case did not involve federal funds or a dispute about whether

the Treasurer had constitutional authority over or possession of funds. Id.

 Garner is therefore distinguishable from the facts before us for the same

reasons as Gardner, and the language relied upon by the Governor is non-binding

dicta. See, e.g., Tr. of Rowan Tech. Coll. v. J. Hyatt Hammond Assocs., Inc., 313 N.C.

230, 242, 328 S.E.2d 274, 281 (1985) (“Language in an opinion not necessary to the

decision is obiter dictum and later decisions are not bound thereby.” (citations

omitted)).

B. Legislative Appropriation Is Not Prohibited by Federal Law

 - 25 -
 COOPER V. BERGER

 Opinion of the Court

 We also disagree with the Governor’s contention that the Block Grants’

enabling statutes and governing federal regulations demonstrate Congress’s intent

to give North Carolina’s executive branch unfettered discretion over the allocation of

the Block Grant funds to the exclusion of the appropriation power of the General

Assembly. Though the Governor cites several decisions from other jurisdictions

holding, under their respective state constitutions, that federal grant-in-aid funds are

not subject to appropriation by their state legislatures, those decisions are not

premised on the legal conclusion that Congress intended state legislatures to have no

say over the allocation and expenditure of block grant funds. See State ex rel. Sego v.

Kirkpatrick, 524 P.2d 975, 985-86 (N.M. 1974) (holding New Mexico’s legislature

could not appropriate federal funds designated to the state’s public institutions of

higher learning because the state’s constitution vested authority over those funds

with a separate Board of Regents); Opinion of the Justices to the Senate, 375 Mass.

851 (1978) (following long-established state precedents and caselaw to opine that

federal funds carrying federal statutory conditions are held in trust outside the

commonwealth’s treasury as established in its constitution and are therefore not

subject to appropriation); In re Okla. ex rel. DOT, 646 P.2d 605, 609-10 (Okla. 1982)

(holding federal grants-in-aid are not subject to appropriation under state law

without addressing Congressional intent as to state legislative appropriation).

 - 26 -
 COOPER V. BERGER

 Opinion of the Court

 The only out-of-state decision cited by the Governor that addresses whether

Congress intended to prohibit state legislatures from appropriating federal block

grant funds is contrary to and undercuts his argument. The Colorado Supreme

Court’s decision in Lamm reviewed the federal grants-in-aid system and several

specific block grants, including the CDBG, MCHBG, and SABG, and concluded that

“Congress has left the issue of state legislative appropriation of federal block grants

for each state to determine.” Lamm, 738 P.2d at 1169.

 Other state courts examining Congress’s intent for allocation of federal block

grant funds have reached the same conclusion. See, e.g., Shapp, 480 Pa. at 468, 391

A.2d at 604 (“Appellants have cited nothing which dictates that the federal laws

pursuant to which these programs are funded requires that the Pennsylvania

legislature is to be by-passed.”); Anderson v. Regan, 53 N.Y.2d 356, 368 n.12 (1981)

(observing, in a decision holding that federal grants-in-aid are subject to state

legislative appropriation, that “the mere application of the appropriation

requirement to Federal funds received by the State is not inherently at odds with any

of the existing Federal mandates”). We agree with the conclusion reached by the

Lamm court and others cited, particularly in light of the apparent intent of the block

grant structure. See supra Part III.A.11

 11 Several legal scholars agree with this analysis of the federal block grant scheme. See, e.g.,
Roderick M. Hills, Jr., Dissecting the State: The Use of Federal Law to Free State and Local Officials
from State Legislatures’ Control, 97 Mich. L. Rev. 1201, 1260-61 (1999) (“[T]hese [block grant] laws are

 - 27 -
 COOPER V. BERGER

 Opinion of the Court

 Counsel for the Governor conceded at oral argument that all of the purposes

for which the General Assembly appropriated the Block Grants fall within the terms

of the federal statutes and regulations governing them, and did not identify any

federal law expressly prohibiting state legislative appropriation.

 We are also unpersuaded by the Governor’s argument that the Block Grants’

enabling statutes and regulations award the grants directly to the Governor or to a

specific state agency. Each of the pertinent statutes directs the grants to be awarded

to the “State,” 42 U.S.C. §§ 300x-21, 702(c), & 5303 (2018), and the definition of

“State” in each statute does not compel the conclusion that the Executive Branch is

the necessary and lone beneficiary or arbiter of the funds rather than the

administrator on behalf of the State as a whole. See 42 U.S.C. § 5302(a)(2) (2018)

(defining “State” under the CDBG as “any State of the United States, or any

instrumentality thereof approved by the Governor” (emphasis added)); 42 U.S.C. §

701(c)(5) (2018) (defining “State” for purposes of the MCHBG as “each of the 50 States

and the District of Columbia”); 42 U.S.C. § 300x-64(b)(2) (2018) (defining “State” as

usually silent about the role of state legislatures. But such silence should not be read to exclude state
legislatures’ role in appropriating federal revenue. . . . [N]othing in the legislative history suggests a
conscious congressional decision to exclude legislative involvement. . . . [T]here seems little reason to
exclude all legislative appropriation of federal grants as a matter of federal law.”); James A. Gardner,
State Courts as Agents of Federalism: Power and Interpretations in State Constitutional Law, 44 Wm.
& Mary L. Rev. 1725, 1752 n.97 (2003) (observing that the U.S. General Accounting Office—now the
U.S. Government Accountability Office—recommended Congress increase state legislative
involvement in federal grants-in-aid in 1980, and that “Congress seems to have followed this
recommendation”).

 - 28 -
 COOPER V. BERGER

 Opinion of the Court

used in the statute creating the SABG as “each of the several States”).12 The fact that

specific State agencies are tasked with administering each Block Grant does not

render those agencies the sole beneficiaries or allocators to the exclusion of the rest

of the State. Cf. Shapp, 480 Pa. at 468, 391 A.2d at 604 (“The funds which

Pennsylvania receives from the federal government do not belong to officers or

agencies of the executive branch. They belong to the Commonwealth. The agency or

official who is authorized to apply for federal funds does so only on behalf of the

Commonwealth.” (emphasis in original)).13

 The Governor also points out that other federal block grant statutes expressly

authorize state legislative appropriation, and contends that the absence of such

authorization in the CDBG, MCHBG, and SABG statutes reflects an intent to

prohibit the General Assembly from appropriating those funds. See, e.g., 29 U.S.C. §

3251(a) (2018) (providing that funds awarded to states under the Workforce

Innovation and Opportunity Grants program “shall be subject to appropriation by the

 12 Even if the grants were awarded directly to the Governor or an Executive Branch agency,
that would not necessarily indicate a choice by Congress to preclude the General Assembly from
appropriating the funds consistent with North Carolina law. See Hills, supra note 11, at 1260-61
(noting that even where federal grants are “bestow[ed] . . . on state executive agencies or governors[,]”
legislative history does not support excluding state legislatures from appropriating the funds);
Gardner, supra note 11, at 1752-53 (acknowledging that while Congress may elect to give federal funds
“directly to specific state executive agencies[,]” such an action does not prohibit state legislative
appropriation).
 13 We note that just as nothing in the North Carolina Constitution appears to enable the

General Assembly to “receive” funds outside the State treasury and to the exclusion of the other
branches, In re Separation of Powers, 305 N.C. at 778, 295 S.E.2d at 596, nothing in the Constitution
appears to give the Executive Branch that authority either.

 - 29 -
 COOPER V. BERGER

 Opinion of the Court

State legislature, consistent with the terms and conditions required under this

subchapter”). We construe that language to permit legislatures in some states—such

as Colorado and Massachusetts—to appropriate those block grant funds where they

would otherwise be barred from doing so under state law. The absence of this

language from the Block Grants at issue here does not alter our conclusion that

Congress left the issue of state legislative appropriation power to the individual

states.14

C. The Block Grants Are Not Otherwise “Custodial Funds” Under State Law

 The Governor also contends that the Block Grants are “custodial funds” held

in trust and not subject to appropriation, but—aside from Gardner and Garner

addressed supra—cites no North Carolina authority suggesting the existence of a

constitutional concept of “custodial funds” that are in the hands of the state treasurer

yet entirely beyond the reach of the General Assembly.15 The Governor does,

 14 The Governor’s argument that the act of legislative appropriation itself violates
congressional intent raises the syllogism that the Block Grant Appropriations are preempted under
the Supremacy Clause of the United States Constitution: if federal law governing the Block Grants
prohibits the General Assembly from appropriating the funds, then any state budget act appropriating
them is preempted by that federal law. Given that we have discerned no Congressional intent to
prohibit state legislative appropriation and there appears to be no actual conflict with the Block
Grants’ enabling statutes—either as to the act of appropriation or the purposes for which they were
appropriated—no preemption has occurred. See, e.g., Stephenson v. Bartlett, 355 N.C. 354, 369, 562
S.E.2d 377, 388 (2002) (noting that North Carolina law is preempted under the Supremacy Clause
where Congress expressly or impliedly intends to preempt state law or where federal law actually
conflicts with state law).
 15 As explained supra, the out-of-state decisions the Governor cites in support of the “custodial

fund” concept were decided against the backdrop of their respective state constitutions and related
jurisprudence. See, e.g., Lamm, 738 P.2d at 1169-72 (relying on a body of state caselaw dating as far
back as 1922 for the concept of “custodial funds” under the Colorado constitution).

 - 30 -
 COOPER V. BERGER

 Opinion of the Court

however, point out that the State Budget Act, N.C. Gen. Stat. §§ 143C-1-1 et seq.

(2019), defines “State funds” as “[a]ny moneys including federal funds deposited in

the State treasury except moneys deposited in a[n] . . . agency fund[,]” N.C. Gen. Stat.

§ 143C-1-1(d)(25), and defines “agency funds” as “[a]ccounts for resources held by the

reporting government in a purely custodial capacity.” N.C. Gen. Stat. § 143C-1-

3(a)(8) (emphasis added). The Legislative Defendants concede that agency funds are

not appropriated under the ordinary budget process called for by the Budget Act. The

Governor argues that the Budget Act’s exclusion of agency funds constitutes the

General Assembly’s “recognition” that there are funds held by the State that are not

subject to legislative appropriation.

 We are not convinced. The fact that the legislature may elect to treat some

funds as custodial in nature as a statutory matter does not mean the funds are

“custodial funds” and not subject to appropriation as a constitutional matter. Cf.

Gardner, 226 N.C. at 467-68, 38 S.E.2d at 316 (holding that non-tax monies held by

the state treasurer in a special fund for a limited purpose pursuant to statute were

nonetheless within the State treasury and subject to legislative appropriation);

Shapp, 480 Pa. at 468, 391 A.2d at 604 (“That funds are designated custodial funds

does not mean that legislative action approving the use of the funds is not needed.”

(citations omitted)).

 - 31 -
 COOPER V. BERGER

 Opinion of the Court

 Nor does it appear that the Block Grant funds are “agency funds” within the

meaning of the Budget Act.16 The General Assembly has been appropriating block

grants—including these Block Grants—without challenge through the budgetary

appropriations process since 1981. And, the Governor’s brief acknowledges that his

preferred allocations of the Block Grant funds were accounted for in his proposed

annual budget, which was submitted to the General Assembly pursuant to the State

Budget Act.

 Further, the State Budget Act provides that “[e]xcept where provided

otherwise by federal law, funds received from the federal government become State

funds when deposited in the State treasury and shall be classified and accounted for

in the Governor’s budget recommendations no differently from other sources[,]” N.C.

Gen. Stat. § 143C-3-5(d), and the Governor is specifically required to “submit [federal]

Block Grant plans to the General Assembly as part of the Recommended State Budget

submitted pursuant to [Section] 143C-3-5.” N.C. Gen. Stat. § 143C-7-2(a) (emphasis

added). While some federal funds may therefore be considered custodial agency funds

for purposes of the State Budget Act depending on the circumstances—such as where

required by federal law—the State Budget Act treats federal block grants as state

funds subject to appropriation through the statutory budgetary process. We do not

 16 Per the evidence in the record, “agency funds” are generally understood, by way of example,
to include monies akin to county vehicle property taxes that the State, through the Division of Motor
Vehicles, collects during the vehicle registration renewal process on the counties’ behalf and later
remits back to the counties for their own appropriation and use.

 - 32 -
 COOPER V. BERGER

 Opinion of the Court

see, and the Governor has not otherwise identified, any federal prohibition against

treating the Block Grant funds as state funds subject to legislative appropriation.

 The logistics by which the State of North Carolina accepts, receives, and

expends the Block Grant funds do not alter our analysis. Although the Governor

asserts generally that the Block Grant Appropriations interfere with the draw-down

process employed to receive and spend Block Grant funds, no evidence in the record

suggests that to be the case. Rather, and by way of example, it appears that instead

of drawing and expending Community Development Block Grant monies for a project

related to “scattered site housing,” as proposed by the Governor, the North Carolina

Department of Commerce must simply draw down and expend CDBG monies for a

project aimed at “neighborhood revitalization,” as appropriated by the General

Assembly. This election of which broad policy aims to fund within the larger national

objective of community development is, fundamentally, a legislative one:

 The legislative branch of government is without question
 the policy-making agency of our government[.] . . . [T]he
 General Assembly is well equipped to weigh all the factors
 surrounding a particular problem, balanc[e] the competing
 interests, provide an appropriate forum for a full and open
 debate, and address all of the issues at one time[.]

Rhyne v. K-Mart Corp., 358 N.C. 160, 169-70, 594 S.E.2d 1, 8-9 (2004) (citations and

internal quotation marks omitted) (third alteration in original). Nothing shows that

the founders of this State, in drafting our Constitution, intended for the Executive

Branch to wield such authority over a category of funds that now constitutes more

 - 33 -
 COOPER V. BERGER

 Opinion of the Court

than a quarter of all State expenditures, and that it could do so free from legislative

control, appropriation, and substantial oversight. This same concern was raised by

New York’s court of last resort:

 Although the framers of the [New York] Constitution
 obviously could not have anticipated the massive role that
 Federal funds were to play in the composition of future
 treasuries, the concerns they expressed at the time that the
 appropriation rule was adopted remain of equal concern
 today.

 ....

 Even more important, however, is the need to ensure a
 measure of accountability in government. As the framers
 of the Constitution astutely observed, oversight by the
 people's representatives of the cost of government is an
 essential component of any democratic system. Under the
 present system, some one third of the State’s income is
 spent by the executive branch outside of the normal
 legislative channels. The absence of accountability in this
 sector of government is, manifestly, an unacceptable state
 of affairs in light of the framers’ intention that all of the
 expenditures of government be subjected to legislative
 scrutiny.

 Finally, we note that application of the strictures imposed
 by section 7 of article VII to Federal funds is necessary to
 the maintenance of the delicate balance of powers that
 exists between the legislative and executive branches of
 government. . . . When the appropriation rule is
 bypassed[,] . . . the Legislature is effectively deprived of its
 right to participate in the spending decisions of the State,
 and the balance of power is tipped irretrievably in favor of
 the executive branch.

Anderson, 53 N.Y.2d at 364-66 (emphasis in original).

 - 34 -
 COOPER V. BERGER

 Opinion of the Court

 In sum, neither the North Carolina Constitution and statutes nor decisions

from other states interpreting their own constitutions suggest the existence of a

category of “custodial funds” held by the State but outside the appropriations power

vested in the General Assembly under Article V, Subsection 7(1) of the North

Carolina Constitution. The Governor does not identify any North Carolina

constitutional provision or caselaw creating one. This Court cannot fashion such a

category out of whole cloth. See Shera v. N.C. State Univ. Veterinary Teaching Hosp.,

219 N.C. App. 117, 127, 723 S.E.2d 352, 358 (2012) (“This Court is an error-correcting

court, not a law-making court.”).

 CONCLUSION

 The North Carolina Constitution plainly provides that “[n]o money shall be

drawn from the State treasury but in consequence of appropriations made by law[.]”

N.C. Const. art. V § 7(1). The federal laws governing the Block Grants identify the

State as the beneficiary of the funds, and they do not prohibit their appropriation by

our General Assembly—the branch that wields exclusive constitutional authority

over the State’s purse. Though some states, applying their own respective

constitutions and statutes, may proscribe state legislative appropriation of federal

block grant funds, our Constitution and law does not permit us to be counted amongst

them, and the Governor has neither rebutted the presumption that acts of the

General Assembly are constitutional nor identified a “plain and clear” constitutional

 - 35 -
 COOPER V. BERGER

 Opinion of the Court

violation. Berger, 368 N.C. at 639, 781 S.E.2d at 252. As a result, we hold that the

Block Grant Appropriations are constitutional as-applied and affirm the ruling of the

trial court.

 AFFIRMED.

 Judges STROUD and TYSON concur.

 - 36 -